IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DOMINIQUE ROMERO-VALDEZ,

    Plaintiff/Counter-Defendant,

v.                                                                                                  No. 1:23-CV-01084-LF-GJF

PARNALL LAW FIRM, LLC

    Defendant/Counter-Plaintiff.

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

THIS MATTER came before the Court on Defendant/Counter-Plaintiff Parnall Law Firm's (hereafter "Parnall") Motion for Summary Judgment on Enforcement of Release, filed March 27, 2024. Doc. 31. Plaintiff/Counter-Defendant Dominique Romero-Valdez filed a response on April 10, 2024, (Doc. 34), and Parnall replied on April 29, 2024 (Doc. 35). Having considered the briefing and the relevant law, I DENY Parnall's motion for the reasons discussed below.

**I.**    **Statement of Facts**[1]

Ms. Romero-Valdez began working for Parnall Law in September 2021. UMF 1. She initially was hired as a Medical Records Assistant and was working as a Legal Assistant in the

---

[1] Defendant's Undisputed Material Facts ("UMFs") appear at pages 3 through 5 of its motion. Doc. 31 at 3–5. Plaintiff's Additional Material Facts ("AMFs") appear at pages 14 through 16 of her response. Doc. 34 at 14–16.

For facts that the parties say they dispute or partially dispute, or which are not cited in the materials, the Court cites to the underlying exhibits and other materials in the record, as necessary. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Case Manager Department at the time of her resignation. UMF 2. She learned she was pregnant on December 22, 2022, and had an expected due date of August 29, 2023. Doc. 34-1 at 1. She had informed Parnall that she planned to have a family before she became pregnant, and she informed her litigation team at Parnall that she was pregnant sometime on or before January 16, 2023. *Id.* Shortly thereafter, Ms. Romero-Valdez contracted COVID-19 and isolated for ten days at her doctor's instructions. *Id.* at 1–2. She was disciplined for calling in sick without adequate Paid Time Off. *Id.* at 2.

On June 27, 2023, at 2:36 p.m., Roni Fraire, Parnall's Operations Manager, met with Ms. Romero-Valdez via Zoom to discuss her employment at Parnall. UMF 3; AMF A; Doc. 34-4 at 1. During that meeting, Ms. Fraire informed Ms. Romero-Valdez that she was not meeting her metrics and could be terminated if this continued. UMF 4; Doc. 34 at 10. She further informed Ms. Romero-Valdez that she either could continue at Parnall and commit to meeting her metrics or resign, effective immediately, and receive six weeks pay as compensation. UMF 5; AMF B; Doc. 34 at 10. Ms. Fraire did not discuss statutory or policy-based leave and did not mention that Ms. Romero-Valdez would have to sign an agreement waiving any future claims to receive payment after her resignation.[2] UMF 4; Doc. 34 at 11; AMF I.

At the conclusion of their meeting, Ms. Romero-Valdez asked Ms. Fraire for time to talk with her husband about whether she would continue at Parnall or resign for payment, a big decision that involved their finances. UMF 6; AMF C. Ms. Fraire told her that she would need Ms. Romero-Valdez's answer at a follow-up meeting scheduled for 9:00 a.m. the following

---

[2] Parnall contends that AMF I is argument because "[i]t is common practice . . . for employers to provide severance payments upon the signing of an agreement." Doc. 35 at 6. To the contrary, *this contention* is argument. Parnall does not actually dispute that Ms. Fraire did not inform Ms. Romero-Valdez that she would have to sign an agreement waiving future claims to receive payment.

2

morning. UMF 6; AMF D. About an hour after the meeting, Ms. Romero-Valdez asked Ms. Fraire if she could have the weekend to think about her decision. AMF E. Ms. Fraire told her that Ms. Fraire was not authorized to grant her more time and already had granted her until the next day without permission. *Id.* Ms. Fraire further stated that she could report that Ms. Romero-Valdez wanted more time to consider her options, but she could not guarantee that the offer would not be revoked. AMF F. Ms. Romero-Valdez was expected to continue working that day until 5 p.m.[3] AMF G.

At the follow-up meeting, which took place the morning of June 28, 2023, Ms. Romero-Valdez informed Ms. Fraire that she had decided to resign her position at Parnall in exchange for six weeks pay. UMF 7. Ms. Fraire then showed Ms. Romero-Valdez the Separation of Employment Agreement (hereafter "Agreement") for the first time, via Zoom, and told her that she needed to sign it "right now before [she was] kicked off the system."[4] AMF H. Ms. Fraire forwarded Ms. Romero-Valdez a copy of the Agreement via email but did not explain the terms and conditions of the Agreement. UMF 7; AMF J. Ms. Romero-Valdez typed her name into the Agreement without asking any questions and sent it back to Ms. Fraire via email. UMF 7. The Agreement read, in relevant part, as follows:

> I agree, for consideration of severance pay of six weeks at my regular hourly rate, to the following: . . . I will not bring any claim, lawsuit or charges against Parnall or any owner, agent or employee, for any reason. Unemployment claims are excluded from this agreement.

Doc. 31-2; UMF 8.

---

[3] I take the date listed in AMF G—June 28, 2023—as a typo and understand that Ms. Romero-Valdez was expected to continue working on June 27, 2023.

[4] As with AMF I, Parnall contends that AMF H is "argument disguised as fact [because] Ms. Romero-Valdez could have told Ms. Fraire that she needed further time to consider the Agreement or could have refused to sign the Agreement." Doc. 35 at 6. Once again, *this contention* is argument. Parnall does not actually dispute the content of AMF H.

On June 30, 2023, the following payday, Parnall direct deposited payment equivalent to 240 hours at Ms. Romero-Valdez's normal pay rate into her bank account. UMF 9. Ms. Romero-Valdez has not returned the payment. UMF 10. Had Ms. Romero-Valdez remained employed at Parnall until the birth of her child, Parnall's policies and statutory law would have entitled Ms. Romero-Valdez to six weeks of paid maternity leave, two weeks of paid parental leave, several hours of paid leave under the New Mexico Healthy Workplaces Act, and twelve weeks of unpaid job protection under the Family Leave and Medical Act. *See* AMF N.[5]

## II.   Discussion

### A. Legal Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In general, "the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."

---

[5] Parnall contends that AMF N is "argumentative" and "not material." Viewing the facts in the light most favorable to Ms. Romero-Valdez, I disagree. Parnall provides no evidence to suggest that this statement is untrue, nor is it argumentative. Moreover, this fact supports Ms. Romero-Valdez's theory of the case and therefore is material.

4

*Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). However, where a movant would bear the burden of persuasion at trial, such as when asserting release as an affirmative defense, the movant must "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 746 (10th Cir. 2014) (citing *Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 947 (10th Cir.1990)); *see also Miles v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 855 F. App'x 433 (10th Cir. 2021) ("Waiver and release are affirmative defenses on which the employer bears the burden.") (citing *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 12 (1st Cir. 1997)).

If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

### B. Analysis

In its motion, Parnall argues that all claims should be dismissed because Ms. Romero-Valdez agreed to not bring any claim, lawsuit, or charge against Parnall in exchange for a severance payment which she has received. Doc. 31 at 5–8. Parnall further argues that the totality of the circumstances show that Ms. Romero-Valdez signed the Agreement knowingly and voluntarily and has therefore waived her Title VII claims. *Id.* at 8–11. In her response, Ms. Romero-Valdez argues that the Agreement was not part of her original, verbal contract to resign, but rather a separate contract for which consideration has not been paid. Doc. 34 at 2–4, 16–17, 20. She further argues that the totality of the circumstances show that she did not sign the Agreement knowingly and voluntarily and therefore did not waive any Title VII discrimination claims. *Id.* at 17–19. Because there are genuine disputes of material fact concerning both whether the Agreement was a separate contract and whether Ms. Romero-Valdez signed the Agreement knowingly and voluntarily, summary judgment is not appropriate.

> **1. There are genuine issues of material fact concerning whether the Agreement was a separate contract for which consideration has not been paid.**

Parnall dismisses as "an incredible story" the contention that Ms. Romero-Valdez's "resignation was one transaction and the [A]greement was a separate transaction," but cites no New Mexico law that undermines this contention. *Id.* at 2, 7. For the reasons explained below, I find that Parnall has not carried its burden of persuasion on this issue. That is, it has not shown that the Agreement was part and parcel of the oral offer that Ms. Romero-Valdez resign in

exchange for six weeks pay, and therefore it has not shown that there is no genuine issue of material fact regarding whether Ms. Romero-Valdez's claims against Parnall were released by the Agreement.

Under New Mexico law, parties form a binding contract when they mutually assent to an agreement supported by consideration. *See Garcia v. Middle Rio Grande Conservancy Dist.*, 1983-NMCA-047, ¶ 22, 99 N.M. 802, 808, 664 P.2d 1000, 1006, *overruled on other grounds by Montoya v. AKAL Sec., Inc.*, 1992-NMSC-056, ¶¶ 11–12, 114 N.M. 354, 356–57, 838 P.2d 971, 973–74; UJI 13-801 NMRA. Mutual assent is ordinarily found "when one party makes an offer, and the other party accepts the offer," and is "based on objective evidence, not the private, undisclosed thoughts of the parties." UJI 13-816 NMRA; *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 13, 125 N.M. 376, 380, 961 P.2d 1283, 1287. "The existence of a contract between parties is generally a question of law to be decided by the trial court. However, when the existence of a contract is at issue and the evidence is conflicting or permits more than one inference, it is for the finder of fact to determine whether the contract did in fact exist." *Garcia*, 1983-NMCA-047, ¶ 22, 99 N.M. at 808, 664 P.2d at 1006; *see also Shively v. Santa Fe Prep. Sch., Inc.*, 21 F. App'x. 875, 878 (10th Cir. 2001) ("[W]hen the evidence is conflicting, whether offer and acceptance existed are questions of fact.").

In this case, the parties agree about the important facts of the interactions between Ms. Romero-Valdez and Ms. Fraire, which gave rise to at least one contract between Ms. Romero-Valdez and Parnall. However, they disagree about the inferences that should be drawn from those facts. I find that the parties proffer plausible but different inferences, each of which would give rise to different contractual obligations; I therefore find that a jury should determine which contract or contracts bind the parties.

There is no dispute about the following facts:

1. Ms. Fraire presented Ms. Romero-Valdez with a dilemma: either continue to work at Parnall as an at-will employee and face the risk of termination with no additional pay or resign immediately and receive six weeks pay. UMF 5; Doc. 34 at 11.

2. The Agreement—and, more specifically, the release of all claims by Ms. Romero-Valdez against Parnall—was never mentioned until after Ms. Romero-Valdez stated that she had decided to resign in exchange for six weeks pay. *See* UMF 7; AMFs H, I.

3. After Ms. Fraire provided a copy of the Agreement, Ms. Romero-Valdez signed within a few minutes—the time she was provided to read and consider the Agreement—and asked no questions about it. UMF 7; Doc. 34 at 12–13.

4. Parnall subsequently paid Ms. Romero-Valdez an amount equal to six weeks pay at her typical wage, and no more. UMF 9; Doc. 34 at 13–14.

Ms. Romero-Valdez attests that she "believed that [she] was being paid six weeks of paid leave to resign immediately . . . as part of the oral agreement [she] had with" Parnall. Doc. 34-1 at 5–6, 13. She did not expect to have to sign the Agreement as part of that oral agreement, *id.* at 5, and she characterizes the Agreement as "an entirely separate offer than the original offer to resign," consideration for which has not been paid by Parnall. Doc. 34 at 2–3, 18, 20. In short, Ms. Romero-Valdez understood that her interactions with Ms. Fraire involved two offers, *see id.* at 2, and therefore gave rise to two contracts: an oral contract under which she would be compensated six weeks pay for her resignation and a written contract governed by the text of the Agreement, including *separate* compensation of an additional six weeks pay. Ms. Romero-Valdez argues that she was paid in satisfaction of the oral contract but has not been paid in satisfaction of the Agreement, and that the Agreement is therefore void. *Id.* at 13, 18, 20.

Parnall contends that Ms. Romero-Valdez signed the Agreement "[a]s part of [the] resignation and severance payment," "understood that agreement and understood that it was part of the transaction in which she resigned and accepted a severance payment," and "had the experience to understand that in a settlement situation, a release would be required." Doc. 31 at 2, 10. Parnall further contends that "[t]he clear language of the Agreement specifies that 'consideration' of six weeks of severance pay would be paid to Ms. Romero-Valdez in exchange for her assent to the terms of the Agreement. Ms. Romero-Valdez received that payment and kept it, after signing the Agreement to obtain it." *Id.* at 8. Finally, in its Reply, Parnall argues that "[i]t is common practice in employment for employers to provide severance payments upon the signing of an agreement," and that Ms. Fraire was not "obligated to tell Ms. Romero-Valdez the obvious fact that before Parnall Law paid her a severance payment, she would sign an agreement, providing consideration to support such a payment." Doc. 35 at 6. In short, Parnall submits that Ms. Romero-Valdez knew that Ms. Fraire's presentation of the option to receive compensation for resignation was not an unconditional offer, that she understood that the Agreement provided the complete expression of her deal with Parnall, and that she is therefore bound by the Agreement.

Each party's account is plausible. Parnall's account does not undermine Ms. Romero-Valdez's sworn statements regarding her understanding at the time of these interactions, nor does Parnall provide any legal or factual citation that shows conclusively that her understanding is incorrect as a matter of law.[6] A jury could, on the evidence presented, find that the interactions

---

[6] At best, I take Parnall to imply that, based on her employment as a legal assistant, Ms. Romero-Valdez "kn[e]w or ha[d] reason to know" that she would have to sign a document that included a release of claims in order to receive her severance payment and thus knew that Ms. Fraire's articulation of the options moving forward did not constitute an offer. *See Associated Home and RV Sales, Inc. v. R. Vision, Inc.*, No. CIV.05 119 JB/DJS, 2006 WL 4109674, at *5 (D.N.M. July

9

between Ms. Fraire and Ms. Romero-Valdez gave rise to an oral contract between Ms. Romero-Valdez and Parnall, and therefore could find that the Agreement, a separate contract that remains unpaid, does not foreclose Ms. Romero-Valdez's claims. *Cf. Barrozo v. Albertson's, Inc.*, No. A-1-CA-36197, 2019 WL 2103053, ¶¶ 14–18 (N.M. App. Apr. 9, 2019) (finding a binding contract where "Employer point[ed] to no objective evidence from which Worker could have known that the offer was intended to be conditional."). In short, the evidence permits materially different inferences. *Garcia,* 1983-NMCA-047, ¶ 22, 99 N.M. at 808, 664 P.2d at 1006. Accordingly, there is a genuine dispute of material fact that prevents summary judgment. *See Shively v. Santa Fe Prep. Sch. Inc.*, No. CIV 98-809 LCS, 1999 WL 35808951, at *2 (D.N.M. Sept. 22, 1999*)* (finding a factual issue regarding whether an offer was accepted because different inferences could be drawn from the evidence); *Farmington Police Officers Ass'n Commun. Workers of Am. Loc. 7911 v. City of Farmington*, 2006-NMCA-077, ¶¶ 18–22, 139 N.M. 750, 757–58, 137 P.3d 1204, 1211–12 (finding that the district court should have denied a motion for summary judgment where evidence was insufficient to eliminate genuine issues of material fact as to what the parties had reason to know when contracting).

---

13, 2006) ("[A] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.") (citing Restatement (Second) of Contracts § 26, Comment A.). To the extent that Parnall is making this argument, the question of whether Ms. Romero-Valdez knew or had reason to know that Ms. Fraire's words represented only a "preliminary negotiation" would still present a genuine issue of material fact. Restatement (Second) of Contracts § 26, Comment A; *see Farmington Police Officers Ass'n Commun. Workers of Am. Loc. 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 19, 139 N.M. 750, 757, 137 P.3d 1204, 1211 ("Application of an objective standard . . . depends upon what hypothetical reasonable contracting parties would have had reason to know under the circumstances. . . . Plaintiffs were required to demonstrate the absence of genuine issues of material fact as to what the [parties] had reason to know of the other's understanding . . . ."); *cf. Elec. Research Products v. Gross*, 120 F.2d 301, 306 (9th Cir. 1941) ("[W]hether a party has reason to know that the other party intends his words or acts to be governed by a usage is a question of fact.").

**2. There are genuine issues of material fact concerning whether Ms. Romero-Valdez signed the Agreement knowingly and voluntarily.**

Title VII employment discrimination claims "may be waived by agreement . . . but the waiver of such claims must be knowing and voluntary." *Torrez v. Pub. Serv. Co. of New Mexico, Inc.*, 908 F.2d 687, 689 (10th Cir. 1990) (citations omitted). To determine if a waiver was knowing and voluntary, the Tenth Circuit applies a totality of the circumstances test that includes seven factors:

(1) the clarity and specificity of the release language;

(2) the plaintiff's education and business experience;

(3) the amount of time plaintiff had for deliberation about the release before signing it;

(4) whether plaintiff knew or should have known her rights upon execution of the release;

(5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel;

(6) whether there was an opportunity for negotiation of the terms of the Agreement; and

(7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Id.* at 689–90. Whether a waiver is knowing and voluntary is a question of fact. *See, e.g., id.* at 690. Having considered these factors and the evidence, at least three factors weigh against a finding that Ms. Romero-Valdez waived her claims knowingly and voluntarily. I therefore find a genuine dispute of material fact on this issue.

First, Ms. Romero-Valdez had exceptionally limited time for deliberation before she signed the Agreement. She was shown the Agreement for the first time after tendering her resignation and told that she needed to sign it immediately. UMF 7; AMF H. This time, mere minutes, falls well short of a timeframe that would indicate a knowing and voluntary release. *See*

11

*Elisberg v. Presbyterian Healthcare Services, Inc.*, No. 05-CV-461 JCH/KBM, 2006 WL 8443836, at *8 (D.N.M. Aug. 10, 2006) (finding genuine factual question where plaintiff was told to sign an agreement immediately during a meeting); *Riddell v. Med. Inter-Ins. Exch.*, 18 F. Supp. 2d 468 (D.N.J. 1998) (same); *see also Pittman v. Am. Airlines, Inc.*, No. 14-CV-0728-CVE-FHM, 2015 WL 2354439, at *5 (N.D. Okla. May 15, 2015) (finding that having one day to deliberate raised a factual issue); *Bittner v. Blackhawk Brewery and Casino, LLC*, No. 03-CV-02274-MSK-PAC, 2005 WL 1924499, at *4 (D. Colo. Aug. 9, 2005) (finding it unclear whether a weekend was sufficient time for deliberation); *Cook v. Buxton, Inc.*, 793 F. Supp. 622 (W.D. Pa. 1992) (finding ten days insufficient).

Second, there is no indication that Ms. Romero-Valdez was encouraged to—or even had time to—seek the advice of counsel before signing the Agreement. Parnall argues that Ms. Romero-Valdez "had time to" seek counsel but proffers no evidence that she was encouraged to do so. Doc. 31 at 10; *see Elisberg*, 2006 WL 8443836, at *7 (factor weighed in favor of unrepresented plaintiff where evidence did not show that employer encouraged to seek counsel); *Nikkel v. Wakefield & Associates, Inc.*, No. 10-CV-02411-PAB-CBS, 2012 WL 5571058, at *9 (D. Colo. Nov. 15, 2012) (finding genuine questions of material fact in part because plaintiff was unrepresented and not advised to seek counsel). Given that Ms. Romero-Valdez was informed of her potential termination late in the afternoon, was required to complete her workday, then signed the Agreement early the next morning, it would be hard to find that she had a realistic opportunity to seek counsel. Likewise, there is no indication that Ms. Romero-Valdez was given an opportunity to negotiate the terms of her resignation or the Agreement. These two factors therefore also weigh against a finding that Ms. Romero-Valdez's waiver was knowing and voluntary.

Taken together, the factors discussed above create a genuine issue of material fact regarding whether Ms. Romero-Valdez's waiver of claims was knowing and voluntary. Moreover, none of the remaining factors clearly demonstrate that Ms. Romero-Valdez's waiver was knowing and voluntary.[7] I therefore deny Parnall's motion for summary judgment because 1) there is a genuine dispute of material fact regarding whether the Agreement is void because no consideration has been paid; and 2) even if the Agreement is part of an otherwise valid contract, there is a genuine dispute of material fact regarding whether Ms. Romero-Valdez's waiver of her Title VII employment discrimination claims was knowing and voluntary.

IT IS THEREFORE ORDERED that Parnall's Motion for Summary Judgment, Doc. 31, is DENIED.

_____
Laura Fashing
United States Magistrate Judge
   Presiding by Consent

---

[7] Though the language of the Agreement was straightforward, it did not specifically indicate that Ms. Romero-Valdez would waive employment discrimination claims. *See Poppelreiter v. Straub Intl., Inc.*, No. 99-4122-SAC, 2001 WL 1464788, at *5 (D. Kan. Oct. 30, 2001) (finding that failure to list or describe waived claims "diminishe[d]" the clarity of a release). Similarly, though Ms. Romero-Valdez worked as a legal assistant and perhaps had the experience to understand the scope of the release, Parnall presents no evidence that she had specific experience with this sort of release or with employment discrimination claims. Finally, although six weeks severance pay is a benefit to which Ms. Romero-Valdez was not otherwise entitled, this case is founded on the allegation that Parnall sought to terminate her employment to avoid fulfilling contractual and statutory leave benefits that would have exceeded the value of six weeks pay. *See* Doc. 34 at 6–7.