**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DOMINIQUE ROMERO-VALDEZ,

     Plaintiff/Counter-Defendant,

v.                              No. 1:23-cv-01084-LF-GJF

PARNALL LAW FIRM, LLC,

     Defendant/Counter-Plaintiff.

**MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

Defendant Parnall Law Firm, LLC (Parnall Law) hereby moves, pursuant to Federal Rule of Civil Procedure 56 and D.N.M.LR-Civ. 56.1, for dismissal of all claims brought by Plaintiff Dominique Romero-Valdez (Plaintiff or Ms. Romero-Valdez).

Ms. Romero-Valdez filed her Second Amended Complaint for Damages and Declaratory Judgment on February 28, 2024 (Doc. 27). In that Second Amended Complaint, Ms. Romero-Valdez asserts a broad panoply of claims, as follows: (I) Constructive and Actual Retaliatory Discharge in Violation of Public Policy; (II) Breach of Implied Contract; (III) Breach of Implied Covenant of Good Faith and Fair Dealing; (IV) Violation of the Family Medical Leave Act and Interference of FMLA Benefits; (V) Interference with Benefits Under the New Mexico Healthy Workplaces Act & Defendant's Policies; (VI) Violations of the New Mexico Human Rights Act, Title VII, and the Pregnancy Discrimination Act; (VII) Retaliation; (VIII) Interference With Rights in Violation of the HRA and Title VII/Unlawful Interference With Statutory Rights; (IX) Breach of Contract and Recission; (X) Fraud; (XI) Defamation; (XII) Declaratory Judgment. As of the date of this Motion, Plaintiff has agreed to dismiss Counts I and XI.

This Motion, and the Memoranda submitted separately in support of this Motion ((i) Memorandum in Support of Motion for Summary Judgment on Counts II and III of Second

Amended Complaint; (ii) Memorandum in Support of Motion for Summary Judgment on Counts IV and V of Second Amended Complaint; (iii) Memorandum in Support of Motion for Summary Judgment on Counts VI, VII, and VIII of Second Amended Complaint; and (iv) Memorandum in Support of Motion for Summary Judgment on Counts IX, X, and XII of Second Amended Complaint, rely on the Statement of Material Facts submitted in this Motion, supported by the Exhibits attached hereto. All references to that Statement of Material Facts will be presented by citing to "Facts" followed by the paragraph number(s) of the Facts referenced.

**<u>Standard for Summary Judgment</u>**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To overcome a motion for summary judgment, the nonmoving party cannot "rely upon unsupported allegations without 'any significant probative evidence tending to support the complaint.'" *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Instead, "the nonmoving party must, at a minimum, direct the court to *facts* which establish a genuine issue for trial." *Id.* (emphasis in the original). "Inferences supported by conjecture or speculation will not defeat a motion for summary judgment." *Self v. Crum*, 439 F.3d 1227, 1236 (10th Cir. 2006); *see also Amparan v. Demir*, 234 F. Supp. 3d 1110, 1115 (D. N.M. 2017) ("A properly supported summary judgment motion will not be defeated by speculative inferences, conclusory allegations, or mere conjecture."). The Facts presented herein are admitted for purposes of these summary judgment proceedings only.

**Exhibits Attached**

**A.**  Dep. of D. Romero-Valdez, relevant portions, and exhibits thereto

**B.**  Rule 30(b)(6) Dep. of Parnall Law (Roni Fraire), relevant portions, and exhibits thereto

**C.**  Dep. of J. Brown, relevant portions

**D.**  Dep. of R. Fraire, relevant portions, and exhibits thereto

**E.**  Dep. of G. Abel, relevant portions

**F.**  Dep. of B. Parnall, relevant portions

**G.**  Plaintiff's Objs. & Resps. to Def.'s First Set Interrogs. & Reqs. for Prod. of Docs. to Pl., relevant portions

**H.**  Def.'s Supp. Answers to Dominique Romero-Valdez's First Set Interrogs., relevant portions

**I.**  E-mails of March 24, 2023 between R. Fraire and J. Brown

**J.**  Decl. of J. Brown, and exhibits thereto

**K.**  Decl. of D. Link

**L.**  Decl. of C. Hopkins

**M.**  Decl. of S. Morales, and exhibits thereto

**N.**  Decl. of R. Fraire

**Statement of Material Facts**

**Plaintiff's Application Process**

1)    In 2021, after Plaintiff had relocated to Santa Fe, Plaintiff, who had never worked at a law firm, was told by her mother, who works at Parnall Law, to apply to work at Parnall Law.  Dep. of D. Romero-Valdez, relevant portions attached hereto as Ex. A, at 8:5-7.

2)    In August of 2021, Plaintiff applied to Parnall Law and underwent an intensive, weeks-long interview process before being offered the position of Medical Records Assistant in

mid-September, 2021.  Ex. A at 25:4-10, 26:2-10; Dep. of R. Fraire, relevant portions attached

hereto as Exhibit D, at 42:19 – 43:15; Dep. of B. Parnall, relevant portions attached hereto as

Exhibit F, at 42:1-9, 72:9 – 73:8.

      3)    Plaintiff began work as a Medical Records Assistant on or about September 17,

2021.  Ex. 4 to Ex. A, Parnall Law Employee Handbook, acknowledged by Plaintiff Sept. 17,

2021.

**Plaintiff's Training as a Medical Records Assistant**

      4)    Upon hire, Plaintiff was trained on Parnall Law's policies and procedures, and she

signed an acknowledgement of receipt of Parnall Law's Employee Handbook on September 17,

2021 and an acknowledgement of understanding on September 20, 2021.  Ex. A at 44:8-14,

60:13-22, 65:15-23; Ex. 4 to Ex. A at 1, 11-13; *see also* Ex. A at 77:6 – 78:23 (Plaintiff

acknowledging that she had access to Parnall Law's Employee Handbook during the course of

her employment).

      5)    Parnall Law's Employee Handbook informed Plaintiff about Parnall Law's "Core

Values," Talent, Teamwork, Truth, Tenacity, and Triumph, and it made clear that Plaintiff's

employment at Parnall Law would be "on an 'at-will' basis and may be terminated by Parnall

Law or the employee at any time for any reason."  Ex. 4 to Ex. A at numbered pages 1-2, 11-12;

*see also* Ex. A at 65:24 – 66:3 (Plaintiff, acknowledging that she understood her employment

with Parnall Law to be at-will); *see also* Ex. A at 128:20-23 (client satisfaction was often

brought up at Parnall Law), 129:10-14 (Parnall Law wanted to do the best job it could for its

clients); Rule 30(b)(6) Dep. of Parnall Law (Roni Fraire), relevant portions attached hereto as

Exhibit B, at 65:14 – 66:1 (Parnall Law uses Core Values and firm mission throughout its

employment processes and operations); Ex. D at 146:5-12.

6)      Parnall Law's Employee Handbook identified Parnall Law's attendance policy, as well as its Paid Time Off policy and Parental and Maternity Leave policies.  Ex. 4 to Ex. A at numbered pages 5-8.

7)      During her initial training, Plaintiff received training on attendance at daily required meetings.  Ex. 6 to Ex. A; Ex. A at 87:24 -89:21.

**Plaintiff's Work as a Medical Records Assistant**

8)      Plaintiff's supervisor when she was a Medical Records Assistant was Eric Doyle. Ex. A at 39:19-25.

9)      Mr. Doyle did not regularly review Plaintiff's work, as expected by Parnall Law, and after Mr. Doyle's employment with Parnall Law was terminated, Parnall Law had little information from which to judge Plaintiff's work as a Medical Records Assistant, and no one available to supervise Plaintiff in that position.  Ex. B at 139:14 – 140:19; *see also* Ex. A at 95:13 – 96:1 (Mr. Doyle gave "minimal to none" guidance to Plaintiff).

10)     Although Mr. Doyle did not regularly review or report on Plaintiff's work, Plaintiff did complete her initial three-month self-evaluation on December 20, 2021, and in his evaluation, Mr. Doyle indicated in the "Evaluation by Team Lead" section that they would "continue to our goal of getting your task list down further."  Ex. 13 to Ex. A at 3; Ex. A at 173:24 – 174:15, 175:24 – 176:3, 177:7 – 178:5; *see also* Ex. D at 185:8 – 186:1 (Mr. Doyle complained to Ms. Fraire about Plaintiff's work performance).

**Plaintiff's Move to the Santa Fe Office**

11)     Plaintiff initially performed work from her home in Santa Fe, and when Parnall Law opened an office in Santa Fe, Plaintiff helped establish that office and then began working from that office.  Plaintiff had a desk, computer, and phone in the Santa Fe office and was

working in that office daily, before she became a Legal Assistant in July of 2022.  Ex. A at

37:11-23, 38:15 – 39:1, 56:21 – 57:1, 136:21 – 138:5, 140:12 – 141:11, 146:22 – 147:12; Ex. D

at 65:3-23.

　　　　12)　　Plaintiff performed significant work helping Parnall Law move into the Santa Fe

office and establish that office between September of 2021, when Parnall Law initially leased the

Santa Fe office and the end of 2021, when the office had been furnished, suitable for work.

Plaintiff continued to work "remotely," as the only member of the Case Manager Team in the

Santa Fe office.  Following her movement to the Legal Assistant role, Plaintiff did perform some

administrative tasks in connection with the Santa Fe office, but Plaintiff was never assigned to be

the administrator of that office, and the expectation from Parnall law was that Plaintiff would

complete the tasks required in her Legal Assistant position.  Ex. D at 121:22 – 122:6 (Plaintiff

just a "presence in the office"), 122:14-22, 123:4-11 (Plaintiff not the "go-to person" for the

Santa Fe office) 159:20 – 160:12 (Plaintiff not required to handle cleaning at Santa Fe office);

Ex. B at 135:22 – 136:14 (Plaintiff using working in Santa Fe as an excuse); Dep. of J. Brown,

relevant portions attached hereto as Exhibit C, at 96:5-13 (Plaintiff used working in Santa Fe as

common excuse with supervisor), 167:4-12 (Ms. Brown later worked in the same Santa Fe office

and did not have "nearly as many issues"); Ex. A at 56:21 – 57:13; *see also* Ex. A at 121:7-20

(Parnall Law did not alter Plaintiff's metrics expectations as a Legal Assistant, despite Plaintiff's

claims that she performed administrative duties in relation to the Santa Fe office).

　　　　13)　　Ultimately, Parnall Law firm management moved another individual, attorney

David Link, into the Santa Fe office, to ensure that Plaintiff was not alone in the office, because

she had indicated that she did not feel fully comfortable working in the Santa Fe office alone.

*See* Dep. of G. Abel, relevant portions attached hereto as Exhibit E, at 24:24 – 26:1; Decl. of D. Link, attached hereto as Exhibit K, at ¶ 1.

14)    David Link was not Plaintiff's supervisor, nor did he oversee or have direct knowledge of Plaintiff's work.  Ex. A at 277:14-25; Ex. D at 51:18-20, 66:4-8, 128:7-9; Ex. K at ¶¶ 2, 3, 4.

**Plaintiff's Move to Legal Assistant**

15)    Because Parnall Law did not have a clear record of Plaintiff's work as a legal assistant, and because there was no one in the Medical Records Team to supervise and continue to train Plaintiff, Ms. Fraire offered Plaintiff the position of Legal Assistant, within the Case Manager Team, which Plaintiff accepted.  Ex. B at 140:7-19; Ex. D at 118:22 – 120:18; Ex. A at 181:7 – 184:9.

16)    Plaintiff began training for the position of Legal Assistant in July of 2022, while transitioning from her work as a Medical Records Assistant.  Ex. A at 99:23, 100:14-21, 101:11-19, 104:5-19; Ex. 7 to Ex. A.

17)    During her training for the Legal Assistant position, Plaintiff received training on attendance at daily required meetings.  Plaintiff also received training on opening insurance claims "(Don't take no for an answer)."  Ex. A at 99:23, 100:14-21; Ex. 7 to Ex. A.

18)    Plaintiff received a Legal Assistant job description as part of her training (referred to as a "scorecard" by Parnall Law).  That Legal Assistant scorecard specified that a Legal Assistant "must," among other tasks: (i) "[a]ttend weekly firm wide huddle every Monday morning at 8:00"; (ii) "[a]ttend daily team mini huddle Tuesday through Friday at 8:00 am"; (iii) "[o]pening all UM/UIM claims within 1 day of signed retainer; (iv) "[o]pening all Liability claims within 1 day of receipt of liability information from police report or IPRA"; and (v)

7

"[e]nsure overdue tasks never exceed 50." Further, that Legal Assistant scorecard specified that it was part of a Legal Assistant's "Duties/Responsibilities" to "[c]omplete all CM/paralegal requests accurately and promptly." Ex. 8 to Ex. A; Ex. A at 115:8 – 116:25, 118:12 -119:20, 121:23 – 124:12, 127:10-23, 130:4-14 (contributing to client satisfaction included having tasks done on cases in a timely fashion).

19)     Plaintiff's initial supervisor was her Team Lead, Robin Niklinski. Ex. C at 63:3-15; Ex. D at 124:9-17.

20)     In September of 2022, Robin Niklinski was promoted to Team Director of the Case Manager Team, and a Case Manager, JaNeisha Brown, was promoted to the Team Lead position on September 12, 2022, supervising Plaintiff's work from that point forward. Ex. C at 23:5-18, 63:3-15; Ex. A at 113:13-25.

21)     After a period during which both Plaintiff and JaNeisha Brown settled into their new positions, JaNeisha Brown regularly "tweeked" with Plaintiff, which meant that she met with Plaintiff at least every two weeks to discuss Plaintiff's work output – her metrics – and timeliness of her task completion. Tweeking is a term used by Parnall Law to indicate regular meetings, held every two weeks – literally shorthand for "two-weekers" – although a supervisor might hold a tweek at any time. Ex. A at 119:24 – 120:6; Ex. B at 67:14 – 68:24 (Employee Policies indicate that personal and team performance should be nothing short of the best, and tweekers are a way to ensure employees meeting those standards, including metrics and scorecard expectations), 132:12 – 133:12; Ex. C at 84:3-15 (Ms. Brown proposed that she start meeting with Plaintiff every week to tweek, hoping it might help Plaintiff's work performance), 103:14 – 104:10 (Plaintiff's metrics started to concern Ms. Brown several months into her supervision of Plaintiff, towards the end of 2022); *see also* Ex. D at 121:13-21.

8

22)    On February 9, 2023, Plaintiff received and acknowledged an updated Employee Handbook for Parnall Law.  That updated Employee Handbook contained an updated Vision Statement, indicating that Parnall Law sought "[t]o be the most respected and trusted personal injury firm across New Mexico."  It contained the same Core Values as the previous version of the Employee Handbook.  It reiterated that Plaintiff's employment was "on an 'at-will' basis and may be terminated by Parnall Law or the employee at any time for any reason."  And it contained an updated "Presence/Absence" section, detailing attendance requirements, Paid Time Off policy, Maternity Leave, Parental Leave, Family Medical Act Leave, and a then-new section separating out earned sick leave under the New Mexico Healthy Workplaces Act.  Ex. A at 131:8-18; Ex. 9 to Ex. A at 1-2, 5-11, 16.

**Parnall Law's Measurement of and Use of Metrics**

23)    Parnall Law utilizes a computer-based case management platform called Smart Advocate.  Through that platform, Parnall Law assigns tasks on a particular case to a particular job position.  Ex. D at 128:7-9; Ex. B at 101:9-17; Ex. A at 46:20 – 47:2, 110:20-22, 188:12-16 (Smart Advocate is not the full way Parnall Law measures performance, but it does keep track of metrics); Ex. F at 100:13 – 101:17.

24)    Legal Assistants are assigned cases alphabetically and randomly through Smart Advocate based on the first letter of the last name of the client.  A particular Legal Assistant may, for instance, be assigned to cases with clients whose names begin with A through D.  Ex. B at 101:9-17; Ex. A at 125:21 – 126:13, 127:1 – 9 (when caseloads increased, they increased for all Legal Assistants, not just Plaintiff); Ex. C at 132:5-25 (Ms. Brown would have noticed if Plaintiff's caseload higher than other Legal Assistants), 150:20 – 151:3; *see also* Ex. A at 48:16-21.

25)     Once a case is assigned to a Legal Assistant, the tasks associated with Legal Assistants automatically populate into Smart Advocate as tasks assigned to that Legal Assistant. Each task automatically identifies a due date, based on requirements for that task.  Ex. D at 73:3-9; Ex. A at 109:21 – 110:5, 110:20-22, 111:7-11; *see also* Ex. A at 48:13-15, 49:10-18, 52:9-13

26)     Legal Assistants are assigned approximately 10 tasks per case, including opening claims with the insurance company.  Opening claims is thought to be the most important task assigned to a Legal Assistant, and Parnall Law requires that liability claims are opened "within 1 day of receipt of liability information from police report or IPRA" and "UM/UIM claims within 1 day of signed retainer."  Ex. 8 to Ex. A; Ex. D at 129:6-21; Ex. B at 146:22 – 147:5; Ex. A at 109:21-25.

27)     Once a Legal Assistant completes all assigned tasks on a case, Smart Advocate still records them as being assigned to that case, even though there are no further Legal Assistant tasks to complete on that case.  Accordingly, the assigned cases number on Smart Advocate does not provide accurate information concerning the number of cases on which a Legal Assistant may have active work.  Further, Legal Assistants who have only been working in that role for a short period will show a smaller number of assigned cases, whereas Legal Assistants who have been working longer will show a larger number of assigned cases.  Ex. B at 107:14 – 108:18, 108:22 – 109:6; s*ee also* Ex. A at 169:6-17, 170:12-15.

28)     When a Legal Assistant completes a task, the Legal Assistant marks the task as complete.  If a Legal Assistant cannot complete a task by the deadline, the task will either be identified as "overdue" or the Legal Assistant can modify the task and manually extend the deadline.  If the Legal Assistant modifies a task, it will be identified as "modified."  Ex. D at

74:18-20; Ex. A at 85:9-11, 85:22 – 86:15, 110:1-5; *see also* Ex. A at 49:19-25; Ex. C at 87:4-19

(explaining modified tasks), 175:15-25 (same).

29)     During the time that Plaintiff worked in the Case Manager Team, the Team had a

goal to try to keep overdue tasks below 50.  Ex. D at 74:10-17; Ex. A at 127:10-21.

**JaNeisha Brown's Supervision of Plaintiff as Her Team Lead**

30)     During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at

Parnall Law, through June 28, 2023, Ms. Brown supervised a total of four Legal Assistants,

including: (i) Dominique Romero, beginning September 12, 2022; (ii) Esteban Marulanda,

beginning September 12, 2022; (iii) Edgar Ortiz, beginning March 7, 2023 and ending May 8,

2023; and (iv) Jenny Montoya, beginning March 22, 2023.  Decl. of J. Brown, attached hereto as

Exhibit J, at ¶ 2.

31)     During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at

Parnall Law, through June 28, 2023, Plaintiff rarely kept her overdue tasks below 50, and

JaNeisha Brown tweeked with Plaintiff on that issue, as well as opening claims timely and

appearing for morning huddles on time, and coached with Plaintiff on those issues on a number

of occasions, including: (i) October 28, 2022; (ii) November 10, 2022; (iii) November 15, 2022;

(iv) December 14, 2022; (v) December 29, 2022; (vi) January 3, 2023; (vii) January 25, 2023;

(viii) February 8, 2023; February 16, 2023 (ix) February 21, 2023; (x) February 24, 2023; (xi)

March 22, 2023; (xii) April 5, 2023; (xiii) April 19, 2023; (xiv) May 3, 2023; (xv) May 4, 2023;

(xvi) May 16, 2023; (xvii) June 13, 2023; and (xviii) June 16, 2023.  Exs. 17, 18, 19, 20, 24, 25,

26 to Ex. A (emails from J. Brown to Plaintiff, outlining discussions had and topics covered at

various tweekers); Ex. J at ¶¶ 3, 4; Exs. A & B to Ex. J.

32)     During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at Parnall Law, through June 28, 2023, Plaintiff consistently had the worst or among the worst metrics of the Legal Assistants Ms. Brown supervised.  Ms. Brown worked to try to help Plaintiff meet her metrics consistently, even assisting on completing tasks on Plaintiff's task list. Ex. C at 226:11-23, 227:11-13; *see also* Ex. C at 64:5 – 66:3 (after working with Plaintiff, Ms. Brown did not believe that Plaintiff possessed the skill-level to do the Legal Assistant job at Parnall Law), 69:7 – 70:10 (same), 106:12-18 (began thinking Plaintiff did not have skills to do the Legal Assistant job in early 2023, after several months of supervising Plaintiff), 113:20 – 114:12 (Ms. Brown did not see dedication from Plaintiff); Ex. D at 76:6 – 77:2 (describing standards applicable to Legal Assistant position), 180:18 – 181:7 (Parnall Law tries to work with its employees over time "until we have no other ideas"), 207:14 – 208:2; Ex. J at ¶¶ 3, 4; Exs. A & B to Ex. J.

33)     During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at Parnall Law, through June 28, 2023, Plaintiff was late to morning huddles a few times per month.  Ex. C at 162:12-21 (Ms. Brown recalls Plaintiff being late and not having that issue with others), 165:17-21, 166:12-23; Exs. 24, 26, 27 to Ex. A; s*ee also* Ex. A at 241:9-19; Ex. K at ¶ 4.

**Plaintiff's Failure to Open a Claim on a "Friend of Bert" Case**

34)     On June 10, 2023, Bert Parnall received an email from an attorney at Parnall Law. At the time, Mr. Parnall was out of the country.  That attorney conveyed to Mr. Parnall that a client called Parnall Law on Saturday, June 10, 2023, that he spoke with the client, and that the client needed assistance opening a claim in order to be able to rent a car.  Ex. 12 to Ex. D; Ex. D at 211:12-19 (attorney had to be involved, because Plaintiff had not performed her job of opening claim, leading to client complaint)

12

35)    Mr. Parnall forwarded that email to Parnall Law's administrative team, Greg Abel and Roni Fraire, and reminded them that the client had come to Parnall Law "through [his] connection" and that opening a claim so the person could obtain a rental car should "be an absolute priority."  In response, on Monday, June 12, 2023, Ms. Fraire told Mr. Parnall that the "claim was set to be open on 6/7 by the legal asst Dominique," that "Dominique had not opened this claim and this is not acceptable."  Ms. Fraire further informed Mr. Parnall that "Dominique is not and has not been performing her role for a while now."  Ex. 12 to Ex. D; *see also* Ex. D at 150:4-17 (identifying what a "Friend of Bert" case is); Ex. E at 33:19 – 34:15, 98:3-8.

36)    Mr. Parnall responded that same day, June 12, 2023, stating "I would let Dominique go, with maternity leave being severance pay.  Unless that is a harsh thing to do to a mother.  If maternity leave is in September, and we've decided to let her go [](and I've heard issues with her before; it's my impression she is not working while alone and remote), I suggest letting her go now."  Ex. B at 157:3-5 (Mr. Parnall has the final say about firing), 172:6-17 (Mr. Parnall wanted to terminate Plaintiff, because he was upset by her failure which led to a client complaint); Ex. F at 50:14-21.

37)    Although Greg Abel responded the next day, June 13, 2023, that he was concerned about appearances, Mr. Parnall responded that "I prefer not to worry about appearances.  We have not fired anyone going on maternity leave before. . . . we're just delaying the inevitable."  Ex. 12 to Ex. D; *see also* Ex. B at 176:8 – 177:9 (Parnall Law not making decision to provide ultimatum based on pregnancy).

38)    Ms. Fraire responded to that email, indicating that she had talked to Plaintiff's supervisors, JaNeisha Brown and Robin Niklinski, and that, due to ongoing performance issues, they were "both ready to let her go."  Accordingly, Ms. Fraire proposed a plan to provide an

ultimatum to Plaintiff, but to give her the choice to resign with a severance payment instead of committing to meeting metrics.  Ex. D at 212:19 – 213:20, 215:16 -216:2, 216:10 – 217:1, 217:2-21 (explaining "Micki Love" ultimatum approach).

39)    On June 13, JaNeisha Brown tweeked with Plaintiff about "Metrics and Opening Claims," following up with an email in which she stated that she "[c]onfirmed a claim was not opened timely on a Bert case and the client complained."  Ms. Brown recounted that she "[a]dvised that Bert is very very upset about this," and that "I am not sure what is going to happen and it is now out of my hands."  Ex. 25 to Ex. A; Ex. A at 246:25 – 249:9; *see also* Ex. A at 244:6, 244:17 – 245:15 (Plaintiff took a screenshot of the email summary of the tweek and also emailed it to herself); Ex. C at 16:11 – 18:14 (Ms. Brown met with Ms. Fraire and Ms. Niklinski to discuss Plaintiff not opening the claim timely before Plaintiff's termination), 19:11-19 (understood Mr. Parnall was upset because claim not opened, so could not work on property damage claim), 20:14-16 (Mr. Parnall gets involved when he is notified).

40)    As of June 13, 2023, Parnall Law had sufficient information and reason to terminate Plaintiff's at-will employment.  *See* Ex. B at 53:3-16, 95:6 – 96:18, 135:22 – 136:14, 141:6-9, 141:23 – 142:9, 142:15 – 143:15, 145:21 – 146:16, 146:22 – 147:5, 148:5-16, 172:6-17; Ex. C at 32:12 – 33:13 (Ms. Brown thought Plaintiff's work not "up to par . . . with the expectations of legal assistants"); Ex. D at 129:13-31 (frequent complaints about Plaintiff not opening cases timely), 147:3-11 ("The way Parnall Law looks at its employees is through their metrics, their culture fit, through their general following basic office policies and procedures. It's many things."), 169:3-21 (Plaintiff not good on "Teamwork" Core Value), 171:8-20 (several Case Managers complained about Plaintiff), 185:8 – 186:1, 198:11 – 199:4, 219:19 – 220:1 (failure to open "Friend of Bert" case was "the last straw"); Ex. E at 85:2-5 (Parnall Law

14

provided ultimatum because Plaintiff was "[u]nable to perform her duties"), 108:22 – 109:8 (Mr. Parnall frustrated because allegations in lawsuit "are false"), 113:16-23; Ex. F at 59:25 – 60:16, 192:9-23, 193:13-21, 195:19 – 196:15.

**Plaintiff Informs Parnall Law of her Pregnancy**

41)     Plaintiff informed a few people, including her mother, who works at Parnall Law, and Robin Niklinski, Director of the Case Manager Team, that she was pregnant on New Year's Eve, December 31, 2022.  Plaintiff informed JaNeisha Brown of her pregnancy sometime after January 1, 2023 but before Parnall Law's employee "goal trip" in January of 2023.  Plaintiff informed others at Parnall Law on that goal trip.  Ex. A at 148:2 – 150:2.

42)     Plaintiff's water broke, and she went to the hospital to give birth on August 29, 2023.  Ex. A at 270:13-18; *see also* Plaintiff's Objs. & Resps. to Def.'s First Set Interrogs. & Reqs. for Prod. of Docs. to Pl., relevant portions attached hereto as Exhibit G, at Interrog. 18.

**Plaintiff Alleges "Bullying" From a Case Manager/Paralegal**

43)     In March of 2023, a then-new Case Manager, Corina Calzada Hopkins, sent several emails to Plaintiff, to check on tasks that Plaintiff had been assigned, and to seek guidance and assistance in understanding which tasks had been completed, so that Ms. Hopkins could complete her own work.  Decl. of C. Hopkins, attached hereto as Exhibit L, at ¶¶ 2, 4.

44)     Eventually, Plaintiff began responding "rock" to Ms. Hopkins, indicating that Plaintiff believed Ms. Hopkins's emails were unnecessary.  On March 20, 2023, Ms. Hopkins reached out to her Team Lead, Robin Niklinski, asking for assistance, because Ms. Hopkins did not understand the "rock" responses, and to understand if she was not following some protocol. Ex. L at ¶ 5; *see* Ex. A at 90:19 – 91:2, 92:17 – 93:6; Ex. 25 to Ex. A at 2 (email from Plaintiff to C. Hopkins).

45)     Following that email, and before Plaintiff had told her Team Lead, JaNeisha Brown, that she believed she was being "bullied," Ms. Brown and Ms. Niklinski held a Zoom meeting including Plaintiff and Ms. Hopkins on March 21, 2023.  Ms. Brown and Ms. Niklinski led a productive conversation, in which Ms. Hopkins was informed of how to check in Smart Advocate for task status, and spoke to Plaintiff about the importance of clear communication, so that everyone can work together as a team.  Ex. C at 196:25 – 198:19; *see also* Ex. A at 221:19 – 223:1, 225:4-12; Ex. L at ¶¶ 6, 7.

46)     Subsequently, in her mid-year Self Review, on March 24, 2023, Plaintiff referred again to the communication with Ms. Hopkins and indicated that she had "experienced a little bit of unnecessary drama and bullying."  In the Team Lead section, Ms. Brown recommended that Plaintiff read a book called Crucial Conversations, which is a book and process that all Team Leads at Parnall Law are trained on, as a way to learn to communicate directly and have hard conversations.  Ms. Brown even reached out to Ms. Fraire to get agreement to allow Plaintiff to take that training.  Ex. 21 to Ex. A at 3-4; *see also* Ex. 23 to Ex. A (email from J. Brown to Plaintiff of March 28, 2023, recommending again the Crucial Conversations book); Ex. B at 57:4-20 (all Team Leads trained in Crucial Conversations course), 70:7-11 (both Ms. Niklinski and Ms. Brown took course); Ex C at 192:2 – 193:16, 194:23 – 195:2, 195:9-14.

47)     Ms. Fraire subsequently reviewed Plaintiff's Self Review and then reached out to Ms. Brown, asking for all communications between Plaintiff and Ms. Hopkins and indicating that she thought Plaintiff's allegation about being "bullied" was a "very serious allegation."  Ms. Brown responded with information concerning the meeting on March 21, 2023.  *See* E-mails of March 24, 2023 between R. Fraire and J. Brown, attached hereto as Exhibit I.

16

48)     Ms. Fraire then conducted an investigation into the allegations, and on April 12, 2023, met with Plaintiff over Zoom to discuss her investigation.  At that meeting, Ms. Fraire expressed her findings that there was no bullying by Corina and reiterated that it was Plaintiff's job, as a Legal Assistant, to help the Case Manager when needed.  Ms. Fraire also expressed that she hoped that Plaintiff had made progress on her reading of Crucial Conversations, to help Plaintiff communicate more effectively.  Ex. 22 to Ex. A; Ex. D at 201:25 – 203:4, 203:25 – 204:5, 204:11-17; Ex. B at 91:14 – 93:14, 93:24 – 94:11, 144:5 – 145:5, 148:5 -11 (Plaintiff accused Ms. Hopkins of "bullying" her without even trying to speak to Ms. Hopkins about the issue); Ex. A at 230:24 – 233:8; *see also* Ex. C at 199:9-25 (not improper for Case Manager to email Legal Assistant about opening claims); Ex. L at ¶ 1.

49)     Plaintiff does not know why Ms. Hopkins allegedly "bullied" her.  Ms. Hopkins's requests from Plaintiff for further help were not related to Plaintiff's pregnancy.  Although Ms. Fraire offered to set up a further meeting with Bert Parnall if Plaintiff wanted to pursue the matter further, Plaintiff declined to set up such a meeting.  Ex. A at 229:8-19, 233:5-20, 239:8-16; *see also* Ex. A at 234:8 – 235:4 (Plaintiff worked to avoid confrontation after the meeting, she did not report further alleged "bullying," and she does not know why Ms. Hopkins was aggressive with her); Ex. F at 110:15 – 113:1 (explaining anti-harassment policy and confirming that complaints can be brought to Mr. Parnall), 123:14 – 124:21.

**Plaintiff Takes Leave for COVID Without PTO to Use**

50)     On July 1, 2022, the New Mexico Healthy Workplaces Act (NMHWA) went into effect.  Parnall Law, at that time, provided for such leave through its Paid Time Off policy, which allowed accrual at a rate greater than the NMHWA.  Ex. B at 23:13-15, 24:4 – 25:18

(Parnall Law initially used a "one-bucket" approach to NMHWA leave, but now uses a "two-bucket" approach); Decl. of S. Morales, attached hereto as Exhibit M, at ¶¶ 3, 4.

51)     Parnall Law sent Plaintiff a poster to post on the wall of the Santa Fe office concerning the NNMHWA, and Plaintiff put it up on the wall in the Santa Fe office.  Ex. A at 160:8-16.

52)     Going in to July 1, 2022, Plaintiff had available PTO of 17.98 hours.  Between July 1, 2022 and December 31, 2022, Plaintiff accrued more than 43.52 hours of additional PTO, which was over 11 hours more accrual than was required by the NMHWA.  During the period July 1, 2022 to December 31, 2022, Plaintiff used 47.27 hours of PTO.  As of December 31, 2022, Plaintiff had 11.10 hours of PTO, which rolled over into 2023.  Between January 1, 2023 and February 4, 2023, Plaintiff accrued an additional 7.34 hours of PTO, which was approximately three hours more accrual than was required by the NMHWA.  Between January 1, 2023 and February 4, 2023, Plaintiff used a total of 20.64 hours of PTO, leaving her with a negative balance of 1.29 hours of PTO as of February 4, 2023.  During the week of January 29, 2023 through February 4, 2023, Plaintiff was out sick, and she took 10.69 hours of unpaid time off during that week.  Ex. M at ¶¶ 2-10; Ex. A to Ex. M; Decl. of R. Fraire, attached hereto as Exhibit N, at ¶ 2; *see also* Ex. B at 28:9 – 29:4 (in 2022, Plaintiff was accruing and using PTO and would have carried over hours under PTO policy), 31:25 – 32:5 (Parnall Law understands that it was complying with the NMHWA at the end of 2022 and beginning of 2023).

53)     Parnall Law policies did not and do not allow employees to take unpaid time off, and employees must generally make up such time.  Accordingly, on February 13, 2023, Plaintiff's supervisor, JaNeisha Brown, emailed Plaintiff and reminded her of Parnall Law's Unpaid Time Off policy and directed her to make up any such hours if missed again in the

future.  Ms. Brown also told Plaintiff in that email that she would place a copy of the email in

Plaintiff's personnel file and did so.  Ex. 5 to Ex. B; Ex. C at 202:22 -204:7; Ex. B at 40:6-25

(although Ms. Brown's email to Plaintiff concerning taking unpaid time off was not directly in

line with Parnall Law's normal practices, it was understandable and in line with Parnall Law's

general no unpaid time off policy), 54:14 – 55:15 (Ms. Fraire, one of the decision-makers

concerning Plaintiff's resignation proposal, did not know if the email was placed in Plaintiff's

personnel file), 58:11-12; Ex. N at ¶¶ 2-6.

54)      At no point was Plaintiff required to make up the unpaid time off she took during

the week of January 29, 2023 through February 4, 2023.  Further, the copy of the email placed in

Plaintiff's personnel file resulted in no employment action against Plaintiff, and it was not

considered in making any further employment decisions about Plaintiff.  After Ms. Brown's

email of February 13, 2023, Plaintiff did not have any further issues concerning unpaid time off.

Ex. C at 203:14 – 204:7; *see also* Ex. B at 35:12-15 ("Q: Well, I mean, not paying them for time

that they don't have is not a penalty; do you agree with that?  A: Correct."); Ex. N at ¶ 7.

**Plaintiff is Presented with an Ultimatum and Resigns**

55)      On June 27, 2023, Ms. Fraire met via Zoom with Plaintiff.  Ms. Fraire indicated to

Plaintiff that she wanted to speak about Plaintiff's plans for continued work at Parnall Law.

Plaintiff indicated that she intended to "work until I – my water broke."  Ms. Fraire then

informed Plaintiff that she wanted to speak about Plaintiff's work performance, including

Plaintiff's failure to open a claim timely on a Bert case.  Ms. Fraire told her that Bert was upset

with Plaintiff because of that, and Ms. Fraire then offered Plaintiff to "either stay working here

and give us your 100 percent, but you could be fired at any time for any reason, or you can take

the six-week paid leave and leave effective immediately."  Ex. 14 to Ex. D; s*ee* Ex. A at 261:2-

22, 262:2 – 264:8, 266:9-11, 268:8 – 269:15, 270:9 – 271:20; Ex. D at 221:11-18, 222:3-11, 225:18-21, 227:3-9; Ex. B at 158:7-14 (Parnall Law wanted a commitment from Plaintiff, or it was prepared to provide a severance payment in exchange for a release), 160:21 – 161:5, 164:6-10, 178:13 – 179:13 (offering her ultimatum rather than just terminating her was a compromise).

56)     Plaintiff and Ms. Fraire did not talk about what type of leave Plaintiff might take for maternity, and Plaintiff did not ask for leave under the Family and Medical Leave Act or Parnall Law's policies at the meeting on June 27, 2023.  Ex. A at 270:9 – 271:20; Ex. D at 193:20-24 (had Plaintiff asked for FMLA leave, she would have been sent to Firm Administrator to apply); Ex. G at Interrog. 18 (Plaintiff would not have taken leave until August 29, 2023).

57)     Ms. Fraire gave Plaintiff until the next morning to decide.  On the morning of June 28, 2023, Plaintiff told Ms. Fraire that she was going to take the six weeks of pay and leave employment.  Ex. A at 274:6 – 276:11.

58)     Ms. Fraire then forwarded Plaintiff a proposed Separation Agreement, which Plaintiff reviewed and signed.  Ex. B at 152:13-22, 165:8-12, 190:20-25, 195:6-16.

**Parnall Law Has Employed Other Pregnant Women Who Have Taken Leave**

59)     Parnall Law has had seven female employees take maternity leave in the past ten years, and six of those employees also took the extra two weeks of parental leave.  Ex. B at 70:17 – 72:6.

60)     Plaintiff's own sister, who works for Parnall Law, took maternity leave after Plaintiff resigned, and she returned to work at Parnall Law after that leave.  Ex. A at 192:6-14.

61)     Plaintiff was aware of other female employees at Parnall Law who took maternity leave when Plaintiff worked there and returned back to work after such leave.  *See* Ex. A at 189:21 – 192:14.

20

62)     Employees at Parnall Law were encouraging when Plaintiff told them she wanted to start a family as early as early 2022, and Plaintiff never heard anyone at Parnall Law express concern about her pregnancy.  Ex. A at 189:8-20, 216:8-16.

**Plaintiff Did Not Complain About Alleged Pregnancy Discrimination**

63)     Plaintiff never complained to her supervisor or anyone in the Case Manager Team or anyone in administration at Parnall Law that she believed she was being treated differently because of her pregnancy.  *See* Ex. A at 215:2-10, 216:12-16, 256:23 – 257:17; *see also* Ex. A at 214:13 – 215:1 ("can't speak for" Ms. Fraire or Ms. Brown concerning their feelings on Plaintiff's pregnancy); Ex. C at 39:16-19 (all meetings between Ms. Brown, Ms. Niklinski, and Ms. Fraire concerning Plaintiff were always about Plaintiff's work performance).

64)     Plaintiff did suggest to the other employee who worked in the Santa Fe office, David Link, on the day before she resigned her employment, that she thought that the reprimand she was receiving was related to her pregnancy.  But Mr. Link did not take Plaintiff's statement as any type of complaint, nor did Mr. Link report Plaintiff's statement to Plaintiff's supervisor or anyone in management at Parnall Law.  Indeed, Mr. Link, who was not Plaintiff's supervisor, did not have any basis to believe that Plaintiff was being singled out due to her pregnancy.  Ex. A at 276:25 – 279:24; Ex. K at ¶¶ 5, 6.

**Plaintiff Was Not Replaced**

65)     When a staff employee departs work at Parnall Law, they are not typically replaced with a new hire.  New hires are simply made when a need exists and after Parnall Law's rigorous hiring process.  Ex. D at 81:7-14.

66)     Since Plaintiff resigned her employment with Parnall Law in June of 2023, Parnall Law has hired various Legal Assistants, both male and female, but did not hire any

additional Legal Assistant until February of 2024.  *See* Def.'s Supp. Answers to Dominique Romero-Valdez's First Set Interrogs., relevant portions attached hereto as Exhibit H, at Interrog. 10.

**Argument**

Defendant incorporates the argument presented in its four supporting Memoranda in support of summary judgment as though fully set forth herein.

**Conclusion**

For all the reasons cited herein, as well as those cited in the separate Memoranda filed in support of this Motion, Ms. Romero-Valdez's Second Amended Complaint, and all claims therein, should be dismissed.

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: */s/ William G. Gilchrist*
      William G. Gilchrist
P. O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
Fax: (505) 768-7375
dgilchrist@rodey.com
*Attorney for Defendant Parnall Law Firm, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 3rd day of July, 2025, I filed the foregoing electronically which caused all counsel of record to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: */s/ William G. Gilchrist*
      William G. Gilchrist

22