IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DOMINIQUE ROMERO-VALDEZ,

    Plaintiff/Counter-Defendant,

v.                                                  Case No. 1:23-cv-01084-LF-GJF

PARNALL LAW FIRM, LLC,

    Defendant/Counter-Plaintiff.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Parnall Law Firm, LLC's ("Parnall")'s Motion for Summary Judgment on Plaintiff's Claims (Doc. 88) and Memorandum in Support of Motion for Summary Judgment on Counts IV and V of Second Amended Complaint (Doc. 90).[1] Ms. Romero-Valdez filed her opposition to the motion on August 25, 2025 (Doc. 120), and Parnall filed its reply on September 16, 2025 (Doc. 129). For the reasons that follow, the Court grants the motion in part and denies it in part.

Count IV alleges that Parnall interfered with Ms. Romero-Valdez's use of her earned and eligible Family and Medical Leave Act ("FMLA") benefits by forcing her to resign before she could take FMLA leave for the birth of her child as well as by failing to inform her of her FMLA rights, both in violation of the FMLA. Doc. 27 at 17; Doc. 120 at 2. Count V alleges that Parnall interfered with Ms. Romero-Valdez's use of her contractual paid time off ("PTO"), sick leave, maternity/parental leave, and FMLA job protection by forcing her to resign before she could take

---

[1] Document 88 includes Parnall's Statement of Material Facts for all four of its motions for summary judgment. Document 90 is the argument supporting the Motion for Summary Judgment on Counts IV and V.

the leave to which she was entitled as well as by "disciplining her for needing leave when she contracted COVID while pregnant, even though [she] was acting in conformity with [Parnall's] policies at the time." Doc. 120 at 2; Doc. 27 at 19.

This Memorandum Opinion and Order addresses only the parties' dispute regarding Counts IV and V of the Second Amended Complaint; the Court therefore rules only in part on Parnall's motion for summary judgment (Doc. 88). It defers ruling on the other arguments in that motion, which will be addressed by separate order.

## BACKGROUND[2]

Ms. Romero-Valdez began working for Parnall as a medical records assistant in 2021. Undisputed Material Fact ("UMF") No. 3.[3] Her employee handbook stated that her employment was at-will. UMF No. 5. (She later received and acknowledged an updated employee handbook, which also stated that her employment was at-will. UMF No. 22.) She transitioned roles to the position of legal assistant in July of 2022. UMF No. 16. In late December 2022 and early January 2023, she informed two supervisors that she was pregnant. UMF No. 41.

During the week of January 29, 2023, through February 4, 2023, Ms. Romero-Valdez was out sick with COVID and took unpaid leave. UMF No. 52. She later received an email from one of her supervisors, JaNeisha Brown, stating that Parnall does not allow unpaid time off,

---

[2] Ms. Romero-Valdez's response to Parnall's recitation of facts includes three categories of response: admit (or partially admit), dispute (or partially dispute), and "unsupported fact," which means that Ms. Romero-Valdez believes that Parnall's cited evidence "does not support the asserted fact." Doc. 118 at 2. The Court has attempted in this brief recitation of facts to include only facts that are not labeled "disputed." For any disputed or allegedly unsupported facts, the Court cites to the underlying exhibits and other materials in the record, as necessary. *See* FED. R. CIV. P. 56(c)(3) ("The court need only consider the cited materials, but it may consider other materials in the record.").

[3] The UMFs are contained in Document 88 at pages 3 through 22.

explaining the proper process for handling an unexpected illness, and stating that the information about this incident would be "added to your employee file." Doc. 88-2 at 30; *see also* UMF No. 53; Doc. 118 at 14 (partially admitting this fact and not specifically disputing that the email was sent).

In mid-June 2023, Ms. Romero-Valdez's supervisors engaged in internal communications suggesting that she failed to open a claim on an important "Friend of Bert" case.[4] UMF Nos. 34–35. Included in that discussion was a statement by one of Ms. Romero-Valdez's supervisors, Roni Fraire, that Ms. Romero-Valdez "is going on maternity leave in September." Doc. 88-4 at 30.

In late June 2023, Ms. Fraire spoke with Ms. Romero-Valdez "about her plans for continued employment at Parnall Law." *Id.* at 31. Ms. Romero-Valdez indicated that she "plan[ned] to return to Parnall Law after she [gave] birth" and that she "want[ed] to work until she [had] the baby." *Id.*; *see also* UMF No. 55. Ms. Fraire discussed Ms. Romero-Valdez's performance, then presented Ms. Romero-Valdez with an ultimatum: "either stay working here and give us your 100 percent, but you could be fired at any time for any reason, or you can take the six-week paid leave and leave effective immediately." UMF No. 55. The next morning, Ms. Romero-Valdez informed her supervisor that she would take the six weeks of pay and leave her employment. UMF No. 57; Doc. 34-1 at 5, ¶ 38; Doc. 93 at 6–7, ¶¶ 7, 8. Ms. Romero-Valdez was given a paper to sign entitled, "Separation of Employment Agreement." UMF No. 58; Doc 118 at 15; Doc. 31-2. The paper included a statement that "I will not bring any claim, lawsuit or charges against Parnall or any owner, agent or employee, for any reason." Doc. 31-2. Ms. Romero-Valdez signed the paper. UMF No. 58; Doc. 34-1 at 6, ¶ 49.

---

[4] Bert Parnall is a principal lawyer at Parnall Law.

**LEGAL STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a 'genuine' issue exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 621 (10th Cir. 1995) (citation omitted).

**DISCUSSION**

I.      **Count IV (FMLA Interference)**

The FMLA prohibits employers from "interfer[ing] with" an employee's "exercise of or the attempt to exercise" FMLA rights. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1)). "To prevail on an interference or entitlement theory, the plaintiff must demonstrate: (1) that [she] was entitled to FMLA leave, (2) that some adverse action by the employer interfered with [her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of [her] FMLA rights." *Id.* (internal quotation marks omitted).

Parnall raises two main arguments regarding why summary judgment in its favor is appropriate: 1) that Ms. Romero-Valdez was not entitled to FMLA leave because she had not yet requested it and did not yet need it, and 2) that Ms. Romero-Valdez was (effectively) terminated for reasons unrelated to her possible future need for FMLA leave. That is, Parnall challenges the first and third elements of Ms. Romero-Valdez's interference claim. The Court addresses each in turn.

### A. Entitlement to FMLA Leave

Parnall argues that Ms. Romero-Valdez was not "entitled" to FMLA leave as a matter of law because she had not yet requested it and did not yet need it. Doc. 90 at 4. The evidence shows that Ms. Romero-Valdez intended to work up to the birth of her baby, but she had not yet given birth. Doc. 88-4 at 30–31; UMF No. 42. Therefore, in Parnall's view, Ms. Romero-Valdez was not yet entitled to FMLA leave because the triggering event that would qualify her to take FMLA leave (the birth of a child) had not yet taken place.

The FMLA defines an "eligible employee" as one "who has been employed (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). The parties do not dispute that Ms. Romero-Valdez meets these requirements. *See* Doc. 27 at 16 ¶ 90; Doc. 29 at 12 ¶ 90.

The FMLA states that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter[.]" 29 U.S.C. § 2612(a)(1). When the necessity of leave for a birth is "foreseeable," the employee "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave . . . except that if the date of the birth or placement requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." *Id.* § 2612(e)(1). The FMLA "does not require a covered employee to specifically ask for FMLA benefits," and the employee "need not expressly assert rights under the FMLA or even mention the FMLA." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 (10th Cir. 2001) (citing 29 C.F.R. §§ 825.302(c), 825.303(b)). Rather, "[i]f the employer is on notice that the

employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply." *Id.* (citing 29 C.F.R. § 825.208(a)).

The advance notice requirement has prompted at least one circuit to find that "employees are protected from interference prior to the occurrence of a triggering event, such as the birth of a child." *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1274–75 (11th Cir. 2012). If an employee was required to provide advance notice of her intention to use FMLA coverage, but she was not yet protected from interference, "the advanced notice requirement becomes a trap for newer employees[5] and extends to employers a significant exemption from liability" that is "inconsistent with FMLA and the purpose of the Act." *Id.* In other words, "pre-eligible" employees are protected from retaliation, or interference, under the FMLA just as eligible employees are protected once they give notice of a potential triggering event. "It would be illogical to interpret the notice requirement in a way that requires employees to disclose requests for leave which would, in turn, expose them to retaliation, or interference, for which they have no remedy." *Id.* (citing *Reynolds v. Inter-Indus. Conf. on Auto Collision Repair*, 594 F. Supp. 2d 925, 928 (N.D. Ill. 2009)).

The Tenth Circuit has not yet ruled on the issue of whether employees who have not yet experienced a triggering event (such as childbirth) but have disclosed their intention to take leave are protected from interference with their FMLA rights (or, indeed, have accrued those rights at all). In the absence of binding authority, the Court follows the persuasive approach of the

---

[5] In *Pereda*, the plaintiff-employee had not yet reached the minimum 1,250 hours of work during a 12-month period, but she would satisfy this requirement "by the time she gave birth and began her requested leave." *Id.* at 1272. The Eleventh Circuit held that even though the plaintiff was not yet eligible for FMLA protections because she had not yet worked the requisite hours and had not yet experienced a triggering event (i.e., the birth of her child), she would be eligible when the time came to take that leave five months after her initial disclosure to her employer. *Id.*

6

Eleventh Circuit and holds that as a matter of law, an otherwise-eligible pregnant employee who notifies her employer of her intention to take FMLA leave but has not yet given birth is protected from interference with her FMLA rights.

Ms. Romero-Valdez was an eligible employee. *See* Doc. 27 at 16 ¶ 90; Doc. 29 at 12 ¶ 90. She was not required to request FMLA leave. *See Tate*, 268 F.3d at 997 (citing 29 C.F.R. §§ 825.302(c), 825.303(b)). She notified her employer of her pregnancy, her intention to take leave for the birth of her child, and her intention to return after maternity leave. UMF Nos. 41, 55; Doc. 88-4 at 31. She was terminated before she became eligible for FMLA leave, but after she had notified her employer of her condition and intention to take leave. UMF Nos. 41–42, 55; Doc. 88-4 at 30–31 (email from Roni Fraire on Monday, June 12, 2023, stating that "Dominique is going on maternity leave in September"). Accordingly, the Court finds that Ms. Romero-Valdez meets the first requirement of a *prima facie* FMLA interference claim and was entitled to leave.

### B. Relationship Between Effective Termination[6] and Exercise of FMLA Rights

Parnall also argues that Ms. Romero-Valdez's termination was not related to her FMLA leave and would have happened regardless of whether she had sought leave. Doc. 90 at 5. It states that "just because Parnall Law's ultimatum ultimately meant that Plaintiff would not take FMLA leave, that does not mean that Parnall Law faces liability under the FMLA. Such an 'indirect causal link' does not meet Plaintiff's burden." Doc. 90 at 7–8 (citations omitted). It argues that Ms. Romero-Valdez was fired because her job performance was inadequate, and that

---

[6] The Court refers to the end of Ms. Romero-Valdez's employment as being terminated or fired, which is language the parties also use and which the Court echoes for consistency and concision. Nonetheless, as discussed above, it is more precise to say that she was offered an ultimatum and chose to resign.

her termination only incidentally affected her ability to use FMLA leave. *Id.* at 9–10. Ms. Romero-Valdez responds that the "temporal proximity"—just two months—between her effective termination and her due date suggests a connection between the two events, and the requirement that Ms. Romero-Valdez sign a release of claims "where [Parnall] had not required any other departing employee in eight years" to do so also suggests a connection between her termination and her intent to use leave. Doc. 120 at 3–4.

It is true that timing can suggest a connection between an adverse action and an employee's intention to use FMLA leave. *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012). But even suspicious timing is not sufficient to prevent summary judgment when an employer provides *undisputed* evidence that the employee would have been terminated regardless of the FMLA leave request. *See id.* at 1227–28. Once a plaintiff satisfies the first two elements of a *prima facie* FMLA interference claim, the employer bears the burden of proving that the employee would have been dismissed even if she had not sought FMLA leave. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1006–07 (10th Cir. 2011) (citations omitted). The Court's inquiry at the summary judgment stage is whether "the evidence is so one-sided that submission to a jury is not required." *Brown*, 700 F.3d at 1227.

Beyond timing, other evidence links the severance offer to Ms. Romero-Valdez's pregnancy and her intention to take maternity/FMLA leave. The undisputed material facts indicate that Mr. Parnall proposed terminating Ms. Romero-Valdez's employment "with maternity leave being severance pay." UMF No. 36. Mr. Abel stated in correspondence regarding her possible termination, "I am against firing Dominique at this time. At this time it does not matter why she is discharged . . . it is going to appear that we are firing her because she is going to take maternity leave." Doc. 88-4 at 29. Ms. Fraire suggested a $4,000 severance package

8

because Parnall would have to pay her $4,032 for her maternity leave if they kept her, based on her rate of pay. *Id.* at 28. In the same email, Ms. Fraire phrased the offer as "a lump sum payment in exchange for the release of claims," linking the severance payment to the release of claims contained in the separation agreement, which presumably included a release of any claim based on the FMLA. *Id.* Further, in Parnall's 30(b)(6) deposition, its representative stated that to her knowledge, no employee other than Ms. Romero-Valdez fired between 2015 and June 28, 2023, was required to sign a release of claims in order to obtain a severance package. Doc. 93-4 at 33, 126:21-127:4; *but see* Doc. 134 at 5 (stating that "[i]t may be fair to find this fact partially disputed" because a Parnall employee testified differently from the 30(b)(6) representative on this point). The circumstances of Ms. Romero-Valdez's termination, therefore, involved evidence—construed in the light most favorable to Ms. Romero-Valdez—that her intention to take leave after the birth of her child was a key component of Parnall's decision to offer her the ultimatum.

Parnall argues that despite its "ham-handed" approach to the ultimatum and termination, it had sufficient reason to terminate her based on her job performance. Doc. 90 at 7. However, much of the evidence of Ms. Romero-Valdez's purportedly inadequate job performance is disputed. *See* Doc. 118 at 2 ("Plaintiff's caliber as an employee is *hotly* disputed[.]"). She contends that during her tenure as a medical records assistant, her supervisor, Eric Doyle, frequently told her she was doing a good job. *Id.* at 16. (Parnall replies that these facts "are not material" and Ms. Romero-Valdez's work as a medical records assistant "is generally relevant only for context." Doc. 127 at 16.) The parties agree that as a legal assistant, Ms. Romero-Valdez's metrics on overdue tasks (determined by a program called Smart Advocate) were worse than the metrics of the other employees supervised by Ms. Brown, UMF No. 31, but Ms. Romero-Valdez argues that the Smart Advocate metrics "lack credibility because they are

9

inaccurate" and could be modified by employees to decrease their overdue task numbers. Doc. 118 at 8–9; *see also* UMF No. 28 (explaining modification option).

The parties agree that as a legal assistant, Ms. Romero-Valdez met with Ms. Brown on six occasions between December 2022 to June 2023 about opening claims timely and appearing on time for morning "huddle" meetings. UMF No. 31. But a live dispute exists as to whether Ms. Romero-Valdez held a "double role[]" as not only a legal assistant but also as a general administrative assistant for Parnall's Santa Fe office. Doc. 118 at 9; *but see* UMF No. 12 (stating that Ms. Romero-Valdez was not assigned to be an office administrator in Santa Fe and maintaining that Parnall's expectation was for Ms. Romero-Valdez to "complete the tasks required in her Legal Assistant position") (disputed, Doc. 118 at 5–6). The parties agree that Ms. Romero-Valdez was late to her morning "huddle" meetings a few times per month, UMF No. 33, but Ms. Romero-Valdez alleges that Ms. Brown "was originally very understanding" but began treating Ms. Romero-Valdez differently after Ms. Romero-Valdez became pregnant, Doc. 118 at 21. Parnall does not dispute this fact, but it states that this information does not create a dispute of fact surrounding Parnall's impression of Ms. Romero-Valdez as an employee. Doc. 127 at 20.

Finally, concerning the issue with the "Friend of Bert" case, the parties also disagree on material facts. The parties appear to agree that Ms. Romero-Valdez was assigned to a Friend of Bert case and that a claim was not opened timely in that case. UMF Nos. 35, 39; Doc. 118-1 at 6–7. But Ms. Romero-Valdez's third affidavit states that two of her colleagues were partially responsible for the error with the Friend of Bert case, but only she was blamed. Doc. 118-1 at 6–7.

Looking generally at the facts before the Court, it appears largely undisputed that Ms. Romero-Valdez sometimes did not meet workplace expectations. The parties agree that at times

10

she was late to meetings, she repeatedly had too many overdue tasks in Smart Advocate, and she was involved in the failure to open a Friend of Bert case. However, when viewing all facts in the light most favorable to Ms. Romero-Valdez, a genuine dispute of material fact exists regarding whether other similarly-situated employees who had similar shortcomings were not disciplined—that is, whether Parnall tolerated shortcomings in other employees that they did not tolerate in Ms. Romero-Valdez because she had notified them that she planned to take leave after the birth of her child. The inquiry is not whether Ms. Romero-Valdez did something that, in the abstract, could be grounds for termination—all at-will employees can be terminated for any legal reason, frivolous or serious, or for no reason at all. The inquiry is whether Parnall can demonstrate that Ms. Romero-Valdez *would have* been terminated had she not expressed her intent to take FMLA leave. On this factual record, enough evidence exists that a reasonable jury could find that Ms. Romero-Valdez was judged more harshly after announcing her pregnancy and intention to take leave, and that another employee who had not requested leave would not have been terminated for the same errors.

Accordingly, the Court DENIES summary judgment on Count IV.

## II.     Count V (NMHWA and Parnall's Policies)

Parnall makes two arguments regarding the NMHWA and Ms. Romero-Valdez's accrued sick leave. First, it argues that Ms. Romero-Valdez did not experience an adverse action, or threat of an adverse action, based on her decision to take unpaid time off when she had COVID. Doc. 90 at 11–12. Second, it argues that Ms. Romero-Valdez accrued leave at a rate greater than that required by the NMHWA and was never prohibited from using that leave. *Id.* at 12. Regarding her unpaid leave when she had COVID, Ms. Romero-Valdez responds that the "email of reprimand" that she received from her supervisor constituted an act of discipline. Doc. 120 at 5.

11

Regarding her accrued leave, Ms. Romero-Valdez responds that "[Parnall] knew [Ms. Romero-Valdez] was going to take leave, but instead of allowing her the option to take leave, it forced her to resign before she could do so." *Id.* at 6. The Court addresses each in turn.

### A. Unpaid Leave Email Placed in Ms. Romero-Valdez's File

The Court first addresses the question of whether the email being placed in Ms. Romero-Valdez's file constitutes an adverse action as that term is used in the NMHWA. *See* N.M. STAT. ANN. § 50-17-8(C) ("An employer shall not count use of sick leave in a way that will lead to discipline, discharge, demotion, non-promotion, less favorable scheduling, reduction of hours, suspension or any other adverse action."). The definitions section of the NMHWA does not define "discipline" or "adverse action." *See generally id.* § 50-17-2. The email that Ms. Romero-Valdez received states, "Just finalized your timesheet and you were at least 8 hours short during the week of 1/30/2023. Per our policy, we do not allow any unpaid time off, meaning I need to report this to management and get it added to your employee file." Doc. 88-2 at 30. The email then outlines expectations for use of sick leave in the future, including that "[i]f you do not have enough PTO to cover unexpected illness, you must make up the time during the week." *Id.*

Although the NMHWA does not define an adverse action, New Mexico case law in other contexts provides guidance. Most analogously, under the New Mexico Human Rights Act, N.M. STAT. ANN. §§ 28-1-1 *et seq.*, an "adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment," with examples of significant changes including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ulibarri v. State of N.M. Corrs. Acad.*, 2006-NMSC-009, ¶ 16, 139 N.M. 193, 200, 131 P.3d 43, 50. No party has presented evidence that the placement of the email in Ms. Romero-Valdez's file caused any

changes to the material circumstances of her work, nor has Ms. Romero-Valdez proposed a different interpretation of the term "adverse action" in the NMHWA.

The question of whether including the email in Ms. Romero-Valdez's file constitutes "discipline" is somewhat murkier given the absence of relevant case law or a definition in the NMHWA. Nonetheless, the Court declines to conflate "discipline" with "correction" or "feedback." An employer may inform an employee that she has done something incorrectly and must correct the error; this is not the same as, for example, a three-strikes policy in which a person is given a "strike" for bad behavior. The latter clearly is discipline, but the former simply describes an act of communication with no articulable negative consequences. Informing Ms. Romero-Valdez that she was not permitted to take unpaid sick leave and explaining what to do in the future, and memorializing that communication in her file, is an act of communication and correction, but not an act of discipline. Summary judgment therefore is appropriate on this component of Count V.

### B. Accrued Sick Leave

Ms. Romero-Valdez alleges that she had accrued nineteen hours of paid leave when she left Parnall and would have continued to accrue 6.668 hours per month until her child was born. Doc. 27 at 18 ¶ 105. Parnall also allowed up to six weeks of paid maternity leave and an additional ten days of paid parental leave pursuant to its employee handbook. Doc. 88-1 at 63. Ms. Romero-Valdez alleges that she was forced to resign before she could use the paid leave she had accrued, take the maternity/parental leave to which she would have been entitled, "or use FMLA." Doc. 27 at 18 ¶ 106.

It is unclear how FMLA or Parnall's maternity/parental leave relate to the NMHWA, which is the statute under which this claim is brought. The NMHWA protects against interference

with "a right granted pursuant to the Healthy Workplaces Act"—that is, paid sick leave accrued under the NMHWA, not the leave accrued under Parnall's policies or the FMLA. *See* N.M. STAT. ANN. § 50-17-8(A). These components of Count V therefore are not legally sound.

Further, there is no evidence to support a claim that Ms. Romero-Valdez faced effective termination based on her impending use of sick leave accrued under the NMHWA (as distinct from her impending use of FMLA leave or maternity/parental leave under Parnall's policies). The discussions between the decisionmakers at Parnall involved her impending maternity leave, not sick leave. *See* UMF Nos. 26, 27. Ms. Romero-Valdez's response does not discuss the approximately four days of paid sick leave she would have accrued by the birth of her baby had she not been fired (assuming she did not use any leave and continued to accrue it until the birth). Rather, it discusses "her needing the option of taking unpaid leave"—a type of leave not granted under the NMHWA, which is specific to paid sick leave. Doc. 120 at 6. Evidence exists in the record of Ms. Romero-Valdez's intention to take maternity/parental leave, but neither party has cited evidence demonstrating any expressed intention by Ms. Romero-Valdez to use her sick leave for the birth of the baby. Accordingly, the Court GRANTS summary judgment in Parnall's favor on Count V.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Parnall's partial motion for summary judgment (Doc. 90). The Court denies the motion with respect to Count IV, but grants it with respect to Count V.

It is so ordered.

LAURA FASHING
UNITED STATES MAGISTRATE JUDGE

14