IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DOMINIQUE ROMERO-VALDEZ,

    Plaintiff/Counter-Defendant,

v.                                                                          Case No. 1:23-cv-01084-LF-GJF

PARNALL LAW FIRM, LLC,

    Defendant/Counter-Plaintiff.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Parnall Law Firm, LLC's ("Parnall") Motion for Summary Judgment on Plaintiff's Claims (Doc. 88) and Memorandum in Support of Motion for Summary Judgment on Counts VI, VII, and VIII of Second Amended Complaint (Doc. 92).[1] Plaintiff filed her opposition to the motion on August 25, 2025 (Doc. 122), and Parnall filed its reply on September 16, 2025 (Doc. 131).

Also before the Court is Plaintiff Dominique Romero-Valdez's Motion for Partial Summary Judgment on Breach of Implied Covenant of Good Faith and Fair Dealing, Fraud, and Pregnancy Discrimination (Doc. 94). Parnall filed its opposition to this motion on August 25, 2025 (Doc. 116), and Ms. Romero-Valdez filed her reply on September 16, 2025 (Doc. 134). For the reasons that follow, the Court grants Parnall's motion in part and denies it in part, and denies Ms. Romero-Valdez's motion with respect to Count VI.

---

[1] Document 88 includes Parnall's Statement of Material Facts for all four of its motions for summary judgment. Document 92 is the argument supporting the Motion for Summary Judgment on Counts VI, VII, and VIII.

Count VI alleges "violations of the New Mexico Human Rights Act [NMSA 1978, §§ 28-1-1 *et seq.*], Title VII [42 U.S.C. §§ 2000e *et seq.*], and the Pregnancy Discrimination Act [amending Title VII to include sex discrimination because of pregnancy, *see* 42 U.S.C. §§ 2000e(k)]." Doc. 27 at 19. Ms. Romero-Valdez claims that Parnall "discriminated against [her] on the basis of her sex and pregnancy by immediately treating her differently after she informed [Parnall] she was pregnant and ultimately forcing her to resign before she could take her maternity leave[.]" *Id.* ¶ 112.

Ms. Romero-Valdez has agreed to dismiss her retaliation claim (Count VII). Doc. 122 at 1. The Court therefore does not discuss Parnall's arguments regarding this claim.

Count VIII alleges "interference with rights in violation of the [New Mexico Human Rights Act] and Title VII/unlawful interference with statutory rights." Doc. 27 at 21. Specifically, Ms. Romero-Valdez claims that Parnall "violated Title VII by requiring a release of rights to file a charge with the [New Mexico Human Rights Board] and the [Equal Employment Opportunity Commission] in its separation agreement, thereby interfering with Ms. Romero-Valdez's protected right to file a charge." Doc. 27 ¶ 127.

This Memorandum Opinion and Order addresses only the parties' dispute regarding Counts VI, VII, and VIII of the Second Amended Complaint; the Court therefore rules only in part on Parnall's motion for summary judgment (Doc. 88) and Ms. Romero-Valdez's partial motion for summary judgment (Doc. 94) insofar as those motions address the counts at issue. It defers ruling on the other arguments in those motions, which will be addressed by separate order.[2]

---

[2] The Court already has denied Ms. Romero-Valdez's motion for partial summary judgment as it pertains to the implied covenant of good faith and fair dealing. *See* Doc. 145. This Memorandum Opinion and Order addresses the motion as it pertains to pregnancy discrimination. A subsequent

## BACKGROUND[3]

Ms. Romero-Valdez began working for Parnall as a medical records assistant in 2021. Undisputed Material Fact ("UMF") No. 3.[4] Her employee handbook stated that her employment was at-will. UMF No. 5. She transitioned roles to the position of legal assistant in July of 2022. UMF No. 16. In late December 2022 and early January 2023, she informed two supervisors that she was pregnant. UMF No. 41. On February 9, 2023, Ms. Romero-Valdez received and acknowledged an updated employee handbook, which stated that her employment was at-will. UMF No. 22.

In mid-June 2023, Ms. Romero-Valdez's supervisors engaged in internal communications suggesting that she failed to open a claim on an important case, UMF Nos. 34–35, and in late June 2023, Ms. Romero-Valdez was presented with an ultimatum: "either stay working here and give us your 100 percent, but you could be fired at any time for any reason, or you can take the six-week paid leave and leave effective immediately," UMF No. 55. The next morning, Ms. Romero-Valdez informed her supervisor that she would take the six weeks of pay and leave her employment. UMF No. 57; Doc. 34-1 at 5, ¶ 38; Doc. 93 at 6–7, ¶¶ 7, 8. Ms. Romero-Valdez was given a paper to be signed entitled, "Separation of Employment Agreement." UMF No. 58;

---

Memorandum Opinion and Order will address the final portion of the motion as it pertains to fraud.

[3] Ms. Romero-Valdez's response to Parnall's recitation of facts includes three categories of response: admit (or partially admit), dispute (or partially dispute), and "unsupported fact," which means that Ms. Romero-Valdez believes that Parnall's cited evidence "does not support the asserted fact." Doc. 118 at 2. The Court has attempted in this brief recitation of facts to include only facts that are not labeled "disputed." For any disputed or allegedly unsupported facts, the Court cites to the underlying exhibits and other materials in the record, as necessary. *See* FED. R. CIV. P. 56(c)(3) ("The court need only consider the cited materials, but it may consider other material in the record.").

[4] The UMFs are contained in Document 88 at pages 3 through 22.

Doc 118 at 15; Doc. 31-2. The paper included a statement that "I will not bring any claim, lawsuit or charges against Parnall or any owner, agent or employee, for any reason." Doc. 31-2. Ms. Romero-Valdez signed the paper. UMF No. 58; Doc. 34-1 at 6, ¶ 49.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a 'genuine' issue exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 621 (10th Cir. 1995) (citation omitted).

## DISCUSSION

Parnall argues that it is entitled to summary judgment on Count VI (discrimination under the NMHRA, Title VII, and the Pregnancy Discrimination Act) and Count VIII (interference with rights under the NMHRA and Title VII). Ms. Romero-Valdez argues that she is entitled to summary judgment on Count VI. The Court addresses Count VI first, then Count VIII.

### I. Count VI: NMHRA, Title VII, and Pregnancy Discrimination Act (Discrimination)

Courts consider employment discrimination claims under the NMHRA and Title VII using the same standard. *See Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 9, 139 N.M. 12, 15, 127 P.3d 548, 552; *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1296 (10th Cir. 2013). Additionally, "[c]laims brought under the [Pregnancy Discrimination Act] are analyzed in the same way as other Title VII claims of disparate treatment." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). The Court's discussion of Title VII therefore applies to all of Count VI unless otherwise noted.

4

To assess Title VII cases, courts employ a burden-shifting inquiry derived from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff bears the burden of making a prima facie case. Variations in case law exist regarding this test. *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). For example, one formulation requires an employee to demonstrate that 1) she "belongs to a protected class," 2) she "was qualified for [her] job," 3) "despite [her] qualifications, [she] was discharged," and 4) "the job was not eliminated after [her] discharge." *Id.* A somewhat broader version requires an employee to prove that 1) she "belongs to a protected class," 2) she "suffered an adverse employment action," and 3) "the challenged action took place under circumstances giving rise to an inference of discrimination." *Bird v. Regents of N.M. State Univ.*, 619 F. App'x 733, 742 (10th Cir. 2015). Regardless, the prima facie case must "show[] actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015) (internal quotation marks omitted). The initial burden is "not onerous." *Id.*

If a plaintiff makes this prima facie showing, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its" adverse employment action. *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008). If the defendant meets this burden, "the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." *Id.*

Parnall argues that Ms. Romero-Valdez did not suffer an adverse employment action, and even if she did, it did not take place under circumstances suggesting illegal discrimination. Doc. 92 at 4. Ms. Romero-Valdez opposes Parnall's motion, Doc. 122, and moves for summary

5

judgment in *her* favor, arguing that she was constructively discharged and given the release of claims to sign specifically because she was pregnant. Doc. 94 at 10–11.

      The Court first considers whether Ms. Romero-Valdez experienced an adverse employment action. Although she chose to take a severance package and leave her employment, the doctrine of constructive discharge applies to Title VII cases. *Penn. State Police v. Suders*, 542 U.S. 129, 143 (2004). "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007). The plaintiff bears a "substantial" burden in a constructive discharge case, and evidence of adverse employment actions or even harassment may not always be enough. *Id.* Rather, "the question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Id.* (internal brackets omitted). The inquiry is an objective one that "depends upon whether a reasonable person would view the working conditions intolerable," not whether an employee subjectively felt that she had a free choice in the matter. *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005).

      Parnall's argument, in short, is that the ultimatum cannot constitute an adverse unemployment action: Ms. Romero-Valdez was given the choice to perform her job duties "at 100%", under the same at-will conditions of employment that she had always worked under, or to leave. She chose to leave, and, Parnall argues, it cannot be a constructive discharge to be told that she was expected to perform her job duties under the same at-will conditions of employment as always. *See* Doc. 92 at 2–4. Ms. Romero-Valdez argues, in contrast, that although she was

given a "choice," "there was really no choice at all." Doc. 94 at 11. In other words, she could quit or be fired.

Parnall cites *Saville v. International Business Machines Corporation*, in which the Tenth Circuit addressed a similar question in the context of retaliation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), which employs the same burden-shifting framework as Title VII. 188 F. App'x 667, 669 (10th Cir. 2006). The plaintiff, Mr. Saville, "began voicing his concerns" about unrecorded overtime, and the next year, he "was given the option of being placed on a performance improvement plan or retiring . . . with a severance package." *Id.* at 668. He was told that if he chose the performance improvement plan, "one complaint would result in termination." *Id.* at 670. After taking a few weeks to think about the decision, Mr. Saville notified his employer that he chose to retire effective the next day. *Id.* at 669. He then sued his employer alleging that he was constructively discharged for his complaints regarding overtime under the FLSA. *Id.* The Tenth Circuit held that even the stringent standards of this performance improvement plan did not "constitute objectively intolerable conditions" necessary to establish constructive discharge. Indeed, "an employer's offer of an alternative to quitting is not consistent with constructive discharge." *Id.* at 670. The Tenth Circuit therefore concluded that "as a matter of law," Mr. Saville retired voluntarily. *Id.* at 671; *see also Stratton v. Bentley Univ.*, 113 F.4th 25, 40 (1st Cir. 2024) ("Though Stratton feared the performance improvement plan 'set the stage' for her firing, an 'apprehension of future termination is insufficient to establish constructive discharge.'" (citation omitted)).

Though *Saville* bears some similarities to Ms. Romero-Valdez's circumstances, they differ in critical respects. Most notably, evidence exists to suggest that the offer presented to Ms. Romero-Valdez was not genuine and that she would be terminated if she chose to stay. Ms.

Romero-Valdez was given only a day to contemplate her offer—evidence that could suggest to a reasonable jury that the offer was not a genuine choice, but rather an effort to pressure her into leaving Parnall quickly.[5] *See Narotzky v. Natrona Cnty. Memorial Hosp. Bd. of Trs.*, 610 F.3d 558, 563 (10th Cir. 2010) (whether recipient of offer "was given a reasonable time in which to choose" is a factor in constructive discharge determination). Ms. Romero-Valdez also states in her third affidavit that when she spoke with Ms. Fraire on June 28, 2023, the day after the ultimatum was issued, she told Ms. Fraire "I was feeling like the safer choice was to quit and [Ms. Fraire] said she agreed." Doc. 118-1 at 7. A reasonable jury could interpret Ms. Fraire's comment as evidence that Ms. Romero-Valdez *would* be fired if she stayed, rather than truly offering her a chance to stay and improve her performance.

---

[5] The inquiry for constructive discharge pertains to whether a reasonable employee would have perceived her working conditions as so intolerable that she is forced to resign. *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009). That is, the standard is an objective one: "the employer's subjective intent and the employee's subjective views on the situation are irrelevant." *Id.* Nonetheless, certain subjective factors have a bearing on what a reasonable person would do.

     Here, ample evidence indicates that Ms. Romero-Valdez's superiors did in fact intend to terminate her employment, either before or after she took maternity leave. *See* Doc. 88-4 at 28–30 ("Dominique is going on maternity leave in September and I'm thinking we just don't bring her back"; "I would say let Dominique go, with maternity leave being severance pay"; "If you think the hard feelings will be harder because it's right before maternity leave, I suppose that's something to think about. But we're just delaying the inevitable."; "[Two other supervisors] are both ready to let [Ms. Romero-Valdez] go"). Indeed, Parnall has argued that "Parnall Law would have either terminated Plaintiff or given her an ultimatum, just as it did, whether or not Plaintiff had requested FMLA leave or was eligible for it, or took it, or needed it." Doc. 90 at 9. That is, Parnall itself argues that Ms. Romero-Valdez's termination was inevitable.

     Due to the objective standard employed in a constructive discharge analysis, this evidence *itself* is not a factor in determining whether a constructive discharge took place: the consideration is whether a reasonable person would have perceived the work environment as intolerable. But this evidence lends credence to some of Ms. Romero-Valdez's observations—for example, her perception that Ms. Fraire's "demeanor" on June 28, 2023, "made it clear that she was not going to accept anything other than for me to quit." Doc. 118-1 at 7. That is, the fact that her employer subjectively intended to terminate her makes it more likely that a reasonable person *would perceive* Ms. Fraire's demeanor, and the overall inevitability of termination, in the way Ms. Romero-Valdez describes.

The Fifth Circuit has considered comments like Ms. Fraire's when determining whether a constructive discharge took place. In *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338–39 (5th Cir. 2014), the court observed that "a plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired. . . . However, in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable." The court pointed to a case in which "the plaintiff presented evidence that his managers informed him that 'it would be in his best interest if he decided to resign rather than be terminated because future employers may ask the City whether Davis resigned or was terminated.'" *Id.* at 339. In another case, evidence of constructive discharge existed where the employer told the employee that it would be unable to retain the employee and that within one week the employee would be put on indefinite unpaid leave. *Id.* (citing *Faruki v., Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997)); *see also Burks v. Oklahoma Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("This court has recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired."); *Vargas v. Public Education Dept.*, No. 21-cv-00600-DHU-JHR, 2024 WL 1051319, at *3 (D.N.M. Mar. 11, 2024) ("An employer's threat of being fired, pressure to resign, or a dramatic pay cut also can serve as the basis for a constructive discharge claim.").

In short, sufficient evidence exists for a reasonable jury to find that a reasonable person would have found Ms. Romero-Valdez's work environment to be intolerable—that she essentially was told to quit or be fired—and that Ms. Romero-Valdez had no choice but to resign. The Court therefore denies Parnall's motion for summary judgment on this issue.

Separately, Ms. Romero-Valdez argues that Parnall's actions in "tricking her into signing a release of claims constitute an adverse employment action." Doc. 122 at 6. That is, knowing

she had chosen to accept the severance package, Parnall included an additional, undiscussed release of rights in the written severance agreement because she was pregnant. An adverse employment action involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004). The phrase "adverse employment action" is liberally defined and is not limited to "monetary losses in the form of wages or benefits." *Id.* at 1239. Courts have held that receiving an inferior severance package compared to similarly situated employees outside the protected class can constitute an adverse employment action. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54–55 (2d Cir. 2001); *Magnan v. Manhattan Eye, Ear & Throat Hospital*, No. 01 CIV. 6306(HB), 2002 WL 334505, at *4 (S.D.N.Y. Feb. 28, 2002). While these cases involved differences in the amount of money offered as a severance package, the release of claims is analogous; it involves Ms. Romero-Valdez walking away with fewer rights than an employee who took a severance package and retained the right to pursue claims against Parnall. The inclusion of a release of claims not normally included in a separation agreement therefore may constitute an adverse employment action.

  Further, Ms. Romero-Valdez has put forth evidence that her constructive discharge and the terms of her separation agreement were related to her pregnancy. The email exchange leading to the decision to issue an ultimatum discusses Ms. Romero-Valdez's pregnancy and intention to take maternity leave extensively, and the proposed "compromise" of an ultimatum occurred because one employee was concerned about the appearance of firing a woman who was about to take maternity leave. *See* Doc. 88-4 at 28–29. Testimony from Parnall's 30(b)(6) representative indicates that Ms. Romero-Valdez was the only employee in the last eight years for whom a

release of claims was included in her separation agreement. Doc. 93-4 at 33, 126:21–127:4; *but see* Doc. 134 at 5 (stating that "[i]t may be fair to find this fact partially disputed" because a Parnall employee testified differently from the 30(b)(6) representative on this point). Evidence also exists that her pregnancy and intention to take maternity leave were factors in Parnall's decision to require a release of claims. *See* Doc. 88-4 at 29. Given these facts, a reasonable jury could find that Parnall engaged in sex discrimination against Ms. Romero-Valdez in violation of Title VII by issuing her an ultimatum and including a release of claims in her severance agreement because of her pregnancy.

This conclusion, however, is not so ironclad that summary judgment in Ms. Romero-Valdez's favor is proper. Evidence also exists that Parnall, or at least an authority figure at Parnall, had presented two attorney employees at the firm with a severance in exchange for a release of claims. Doc. 117-1 at 2, 56:23–57:23. This evidence contradicts the 30(b)(6) deposition discussed above, but the jury must decide this dispute of fact. Additionally, a genuine dispute of material fact exists regarding the caliber of Ms. Romero-Valdez's work performance such that a reasonable jury could find her effective termination to be based on permissible, non-discriminatory factors. *See* Doc. 149 at 9–11.

The Court therefore DENIES Parnall's motion for summary judgment on Count VI and DENIES Ms. Romero-Valdez's motion for summary judgment on Count VI.

## II.   Count VIII: NMHRA and Title VII (Interference)

Ms. Romero-Valdez also alleges that Parnall interfered with her rights under the NMHRA and Title VII by requiring her to release her rights to file a charge with the New Mexico Human Rights Bureau ("HRB") and the Equal Employment Opportunity Commission ("EEOC") in her separation agreement. Doc. 27 at 21. Parnall argues that Ms. Romero-Valdez has not exhausted

her administrative remedies under the NMHRA and Title VII. Doc. 92 at 16–17. More specifically, it argues that Ms. Romero-Valdez did not exhaust her administrative remedies *with regard to Count VIII*. She did submit a claim to the HRB and EEOC regarding the events giving rise to this litigation, *see* Doc. 92-1, but in that claim, she did not state that Parnall's separation agreement interfered with her NMHRA or Title VII rights. Doc. 92 at 1–2.

Ms. Romero-Valdez disagrees. Doc. 122 at 2–3. Her response states that she "disputes that she must submit a claim **to the HRB/EEOC** that [Parnall] was trying to keep her from submitting a claim **to the HRB/EEOC** based on her pregnancy." *Id.* at 2 (emphasis in original). She provides no citations to support this argument. Parnall cites to *McDonald-Cuba v. Santa Fe Protective Services, Inc.*, 644 F.3d 1096 (10th Cir. 2011), which involved allegations that an employer had filed a counterclaim *in the Title VII case itself* out of retaliation. *Id.* at 1100. The Tenth Circuit held that the plaintiff had not exhausted administrative remedies on this claim: that is, she had not filed a new or amended charge of discrimination with the EEOC alleging that her employer retaliated against her by filing a counterclaim in her Title VII action. *Id.* at 1101. The Court stated that the plaintiff's "post-termination retaliation claim based on [her employer's] filing of a counterclaim, then, falls within our general rule that exhaustion of administrative remedies is a jurisdictional[6] prerequisite to a Title VII suit." *Id.*

The general rule is that a plaintiff must timely file an EEOC charge containing each discrete incident at issue and receive a right-to-sue letter before bringing a Title VII action.

---

[6] The Tenth Circuit has since clarified that exhaustion of administrative remedies is *not* a jurisdictional prerequisite to a Title VII suit, but rather the basis for an affirmative defense. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185–86 (10th Cir. 2018). Parnall raised failure to exhaust administrative remedies as an affirmative defense in its answer. Doc. 29 at 23 ¶ J. Exhaustion of administrative remedies is, however, a jurisdictional bar under the NMHRA. *Newberry v. Mascaro*, No. 2:24-cv-00020-GJF-JHR, 2024 WL 5076294, at *2 (D.N.M. Dec. 11, 2024) (collecting cases).

*Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018). The parties have not cited, and the Court has not found, case law creating an exception to this rule for interference claims. Even if an exception might be warranted under particular circumstances—something the parties have not demonstrated is a possibility as a matter of law—no such circumstances warrant an exception here. Ms. Romero-Valdez *did* file an administrative complaint with the EEOC. Doc. 92-1. She therefore had the ability to allege interference in that complaint (and in fact, she claims that she did, Doc. 122 at 2). That is, the interference, if it occurred, was not so severe as to prevent her from pursuing and exhausting her administrative remedies. Therefore, the Court will require exhaustion of administrative remedies as a prerequisite to Ms. Romero-Valdez's interference claim.

Having established that Ms. Romero-Valdez is required to exhaust administrative remedies regarding her Title VII interference claim, the Court next considers whether she has done so. Ms. Romero-Valdez alleges that Parnall "violated Title VII by requiring a release of rights to file a charge with the HRB and the EEOC in its separation agreement, thereby interfering with Ms. Romero-Valdez's protected right to file a charge." Doc. 27 at 21. The portion of the administrative complaint that references the separation agreement reads as follows:

> Based on Ms. Fraire's threatening tone and works [sic], Dominique firmly believed she was going to be terminated upon returning from leave after giving birth without any severance package, so Dominique reluctantly agreed to resign from Parnall Law Firm. Ms. Fraire immediately and unexpectedly sent Dominique a Separation of Employment Agreement (the "Separation Agreement") and told her she needed to sign it "right now before she gets kicked off the system." When Ms. Fraire posed the two evil choices to Dominique (take maternity leave and expect to be fired OR resign and get six weeks' severance), she did not tell Dominique that she would have to sign some type of agreement. When she suddenly demanded Dominique sign the Separation Agreement, she did not explain the terms and conditions to Dominique nor give Dominique time to review it independently or consult with a lawyer. Dominique understood she had no choice but to sign the Separation Agreement right that minute, which she did, and then she was kicked off the system approximately five (5) minutes later.

Doc. 92-1 at 3. This portion of the charge discusses the separation agreement, but it does not contain any reference to the release of rights contained in the agreement, which is the basis for Ms. Romero-Valdez's interference claim.

Courts "liberally construe the allegations in [an] EEOC charge, which must contain facts concerning the discriminatory and retaliatory actions underlying each claim." *Clark v. 10 Roads Express, LLC*, No. 23-3067, 2023 WL 6997397, at *1 (10th Cir. Oct. 24, 2023) (unpublished) (quotation marks omitted). "A plaintiff's claim in court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Smith v. Cheyenne Retirement Investors L.P.*, 904 F.3d 1159, 1165 (10th Cir. 2018) (emphasis and citation omitted).

Here, the administrative investigation that can reasonably be expected to follow Ms. Romero-Valdez's charge would include an inquiry into whether she was constructively discharged on the basis of her pregnancy. Reasonable inquiries would include an examination of whether Ms. Romero-Valdez voluntarily signed the separation agreement or was coerced. However, the charge contains no indication that the *terms of the separation agreement themselves* were problematic. The charge focuses only on the circumstances under which Ms. Romero-Valdez signed the agreement. There is no mention of the fact that the separation agreement even contained a release of claims. A reasonable EEOC investigation likely would not explore the contents of the separation agreement at all given the description in the charge.

Accordingly, the Court finds that Ms. Romero-Valdez did not exhaust her administrative remedies with regard to her interference claim. The Court therefore GRANTS summary judgment in Parnall's favor on Count VIII.

## CONCLUSION

For the reasons discussed above, the Court GRANTS IN PART AND DENIES IN PART Parnall's motion for summary judgment on Counts VI and VIII (Doc. 92). It denies the motion as it pertains to Count VI, and it grants the motion as it pertains to Count VIII. The Court DENIES Ms. Romero-Valdez's motion for summary judgment as it pertains to Count VI (Doc. 94) but DEFERS ruling on that motion as it pertains to Count X (Fraud), which will be addressed by separate order. Ms. Romero-Valdez has agreed to dismiss Count VII, so the Court finds the component of Parnall's motion seeking summary judgment on Count VII moot.

It is so ordered.

_____
LAURA FASHING
UNITED STATES MAGISTRATE JUDGE