IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| DOMINIQUE ROMERO-VALDEZ, | § | |
| | § | |
| Plaintiff/Counter-Defendant, | § | |
| | § | |
| v. | § | 1:23-CV-01084-LF-GJF |
| | § | (JURY DEMANDED) |
| PARNALL LAW FIRM, LLC, | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | |

## PRETRIAL ORDER

This matter is before the Court pursuant to Fed. R. Civ. P. 16.  The parties conferred and submit the following Pretrial Order.

## I.  APPEARANCES

Attorneys who will try this action:

|  |  |
|---|---|
| For Plaintiff | Samantha Adams |
| | Arlyn Crow |
| | Hannah Kohler |
| | ADAMS+CROW LAW FIRM |
| | 5051 Journal Center Blvd. NE, Suite 320 |
| | Albuquerque, NM 87109 |
| | (505) 582-2819 |
| | Sam@adamscrow.com |
| | Arlyn@adamscrow.com |
| | Hannah@adamscrow.com |
| | |
| For Defendant(s) | William Gilchrist |
| | Lisa G. Zammiello |
| | RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A. |
| | P.O. Box 1888 |
| | Albuquerque, NM 87103 |
| | (505) 765-5900 |
| | dgilchrist@rodey.com |
| | lzammiello@rodey.com |

## II.  JURISDICTION AND RELIEF SOUGHT

**A.**  **Subject Matter Jurisdiction.**

   **1.**  **Was this action removed or transferred from another forum?**  _X_  Yes __  No

   If yes, was the action removed or transferred?

   _____X_____  Removed         _____  Transferred  _____  Original forum

   **2.**  **Is subject matter jurisdiction of this Court contested?**

   ___X_____  Uncontested         _____  Contested  _____  Party contesting

   **3.**  **Asserted basis for jurisdiction.**

   ____X_____  Federal Question  _____  Diversity  _____  Other

   Statutory Provision(s) Invoked:  29 U.S.C. § 2601, *et seq.* and 42 U.S.C. § 2000e, *et seq.*

**B.**  **Personal Jurisdiction and Venue.**

   **1.**  **Is personal jurisdiction contested?**

   ___X____  Uncontested_____  Contested

   Identify the party contesting personal jurisdiction and basis for objection:

   __N/A_____

   **2.**  **Is venue contested?**

   ___X____  Uncontested         _____  Contested  _____Party Contesting

   Identify the party contesting personal jurisdiction and basis for objection:

   __N/A_____

**C.**  **Are the proper parties before the Court?**

   ___X____  Uncontested_____  Contested

   If contested, identify each missing party or improper party and the basis for contention:

   __N/A_____

D.    **Identify the affirmative relief sought in this action.**

1.    Plaintiff seeks: Money damages and equitable relief

2.    Defendant seeks: Money damages

### III.  BRIEF DESCRIPTION OF NATURE OF CLAIMS/DEFENSES

A.    **Plaintiff's claims:**

Ms. Romero-Valdez filed this case after she was fired by Parnall Law Firm LLC ("Parnall Law Firm" or "PLF") in June 2023, when she was seven months pregnant and planning to take all paid leave to which she would be entitled from PLF to give birth to her first child. That leave would have included 6 weeks of paid maternity leave and 2 weeks of paid parental leave. Depending upon the circumstances of the birth, Ms. Romero-Valdez may have also taken additional unpaid leave available to her under the Family and Medical Leave Act ("FMLA"). Parnall Law Firm pressured Plaintiff into supposedly "resigning" and signing a supposed release of claims against PLF in circumstances that were both unethical and illegal. In response to disagreement amongst PLF management as to whether it was appropriate to fire a pregnant woman who was about to take maternity leave, PLF developed a "compromise" in which it would offer (threaten) Ms. Romero-Valdez a "lump sum payment in exchange for the release of claims ([giving her] maybe 24-48 hours to consider)." Alternatively, if she declined, she would have a brief amount of time "to get her metrics caught up, and keep them up, or be terminated with no severance package." However, this is not the offer PLF actually presented to Ms. Romero-Valdez.

When Parnall Law Firm presented its ultimatum to Ms. Romero-Valdez via its Operations Director, the Operations Director was threatening and intentionally excluded key factors Ms. Romero-Valdez should have been able to consider in making her decision. The Operations Director made it seem as though Ms. Romero-Valdez could never be successful at PLF, and reminded her that, if she chose to stay, she could be fired at any time for any reason without any

separation package at all. Despite two requests for additional time, Parnall Law Firm allowed Ms. Romero-Valdez less than 18 hours to make her decision, leaving her without the opportunity to consult an attorney.

Importantly, PLF did not tell Ms. Romero-Valdez she would have to agree to not sue Parnall Law Firm in order to accept the severance pay until *after* Ms. Romero-Valdez said she would resign. The supposed separation agreement was presented to Ms. Romero-Valdez while she was visibly distraught, without any explanation, and described merely as "a paper to be signed." Ms. Romero-Valdez was led to believe she had to sign the separation agreement immediately, and she did so in less than 12 minutes.

The circumstances in which Parnall Law Firm fired Ms. Romero-Valdez constitute the following: Breach of Implied Covenant of Good Faith and Fair Dealing; Violation of the Family and Medical Leave Act and Interference with FMLA Benefits; Violations of the New Mexico Human Rights Act, Title VII, and the Pregnancy Discrimination Act; Retaliation; Interference with Rights in Violation of the HRA and Title VII/Unlawful Interference with Statutory Rights; Breach of Contract (entitling Ms. Romero-Valdez to Recission); Negligent Misrepresentation; and Fraud. Additionally, the separation agreement is unenforceable because (i) it is unsupported by consideration, (ii) it contains an illegal release of claims without a severance clause, and (iii) was obtained under duress.

Plaintiff incorporates the arguments and defenses raised in her Motions for Summary Judgment and Replies thereto, as well as her Responses to Defendant's Motions for Summary Judgment [Docs. 93, 94, 95, 118, 199, 120 121, 122, 132, 133, 134]. Plaintiff also incorporates all Requests for Admission admitted by Defendant.

**B.**    **Defendant's defenses:**

Parnall Law prides itself on providing excellent legal representation to personal injury clients in New Mexico.  It maintains high standards for its employees in order to meet the standards it sets for itself.  Plaintiff was an underperforming at-will employee who was repeatedly counseled for not meeting the requirements of her job.  Plaintiff initially worked remotely and then as the sole member of her work group at Parnall Law in Parnall Law's Santa Fe office.  Plaintiff did not handle the workload, job requirements, normal job stresses, and remote work well, and Plaintiff did not improve after repeated attempts to help her meet the requirements of her position.  Parnall Law provided Plaintiff with ample training and support to meet the requirements of her position, but Plaintiff continued to fail to meet requirements, and her attitude was poor.

Plaintiff failed to timely open a claim for a client of Parnall Law on a "Friend of Bert" case in June of 2023.  As a result of that failure and Plaintiff's history as an underperformer, management at Parnall Law decided to offer Plaintiff the choice to either resign with a severance payment or to fully commit to her position.  Plaintiff chose to resign.  Plaintiff signed a Separation of Employment Agreement as part of that resignation and payment of severance, and Parnall Law paid Plaintiff the severance payment.  Parnall Law's decision to offer Plaintiff that choice was not motivated by any discriminatory animus, it was not based on Plaintiff's pregnancy, and it was not motivated by any desire to deny Plaintiff leave which she may have been entitled to had she decided not to resign.

Parnall Law did not act in bad faith in offering Plaintiff the Separation of Employment Agreement or in obtaining Plaintiff's signature on that agreement.  Plaintiff was not entitled to FMLA benefits at the time she quit employment, and Parnall Law did not interfere with any such

benefits, because Parnall Law offered Plaintiff the ultimatum based on her poor work performance. Parnall Law's decisions were made in good faith and were reasonable business decisions.

Parnall Law's decisions did not take place under circumstances that give rise to an inference of discrimination. As of June 2023, Parnall Law had sufficient legitimate reasons to make its decisions with respect to Plaintiff's employment, and it based its decision on those legitimate reasons, and those reasons were not a pretext for discrimination. Plaintiff did not engage in any protected activity as that term is used in relevant statutory law, and in any event Parnall Law's decisions were not motivated by any such alleged activity.

To the extent Plaintiff claims she has been damaged, she has wholly failed to mitigate such damages. She did not apply for even one similar position, and the few jobs she did apply to were less-than-half-hearted attempts to obtain employment. To the extent Plaintiff is entitled to damages, such damages must be reduced or eliminated.

Parnall Law hereby also incorporates all affirmative defenses raised in its Answer to Second Amended Complaint for Damages and Declaratory Judgment (Doc. 28), as well as all argument and defenses raised in its Motion for Summary Judgment (Doc. 88) and the four supporting memoranda (Docs. 89, 90, 91, 92).

## C.    Defendant's Counterclaim:

Defendant claims that Plaintiff entered into the Separation of Employment Agreement on June 28, 2023, that the Separation of Employment Agreement is enforceable, that the Separation of Employment Agreement contains an agreement not to sue, and that Plaintiff breached that agreement by filing the current lawsuit. Defendant claims that it is entitled to damages resulting from Plaintiff's breach.

D.    **Plaintiff's Defense to Defendant's Counterclaim:**

The separation agreement is unenforceable because (i) it is unsupported by consideration, (ii) it contains an illegal release of claims without a severance clause, and (iii) was obtained under duress, in bad faith, and by misrepresentation. First, PLF offered Ms. Romero-Valdez two weeks' pay in exchange for her immediate resignation, which she accepted. There was no mention of a separation agreement or release of claims until after Ms. Romero-Valdez accepted the offer to resign. PLF has paid Ms. Romero-Valdez the equivalent of two weeks' pay only once, leaving the separation agreement without consideration. Second, the release contained in the separation agreement does not exclude employment claims that are unwaivable under the circumstances. As there is no severance clause, the entire agreement is unenforceable. Finally, the specific circumstances in which PLF obtained Ms. Romero-Valdez's signature amount to duress (*see* uncontested and contested issues of fact, below; *see also* Ms. Romero-Valdez's Motion for Partial Summary Judgment that the Separation of Employment Agreement is Unenforceable [Doc. 95]).

Ms. Romero-Valdez also incorporates the affirmative defenses asserted in her Amended Answer to Parnall Law Firm LLC's Counterclaim for Breach of Contract and Promissory Estoppel [Doc. 14].

## IV.  FACTUAL CONTENTIONS UNDERLYING CLAIMS/DEFENSES

A.    **Stipulated Factual Contentions.**

The parties agree to the following facts listed separately below:

1.  Venue is proper in this United States District Court for the District of New Mexico

2.  The United States District Court for the District of New Mexico has jurisdiction of the parties and the subject matter.

3.  In September 2021, Plaintiff began working for Parnall Law Firm as a Medical Records Assistant.

4.  In July of 2022, Plaintiff became a Legal Assistant in the Case Manager Department until her employment with Parnall Law Firm ended on June 28, 2023.

5.  At the time Plaintiff was employed at Parnall Law Firm, it had more than 50 employees with offices in Albuquerque, Santa Fe, and Rio Rancho.

6.  Roni Fraire was the Operations Director of Parnall Law Firm at the time Plaintiff's employment ended.

7.  While Plaintiff was employed with Parnall Law Firm, Ms. Fraire had primary responsibility for the hiring and firing functions for Defendant, though she does not make any terminations without approval from Mr. Bert Parnall.

8.  Parnall Law Firm was Plaintiff's first job in the legal field.

9.  In or around July 2022, Ms. Fraire offered Plaintiff a new role as Legal Assistant.

10. Plaintiff informed one of her supervisors that she was pregnant on December 31, 2022, and her other supervisors and coworkers at Parnall Law Firm in January and February 2023.

11. On June 27, 2023, Plaintiff was seven months pregnant.

12. During the meeting on June 27, 2023, Plaintiff asked Ms. Fraire if she could give her answer to the Ultimatum the following Monday, Ms. Fraire responded, "I wasn't given authority to grant a time. I granted you until tomorrow, without permission. I am scheduled to report your answer tomorrow. I can report that you want time to consider the options, but I can't tell you that the offer won't be pulled. Tell me what you'd like me to do."

13. Ms. Fraire e-mailed Plaintiff the Separation of Employment Agreement during the Zoom meeting on June 28, 2023.

14. The meeting between Defendant and Plaintiff on June 28, 2023, began at 9:00 am and the Written Contract was signed by 9:12 am.

15. Plaintiff signed the Written Contract on June 28, 2023, within twelve minutes of Ms. Fraire first presenting the Written Contract to her.

16. None of the employees who were fired by Defendant between May 19, 2015, and June 28, 2023, were pregnant.

17. The Written Contract includes: (i) a confidentiality provision; (ii) an attestation that Plaintiff does not possess Firm property; (iii) a non-solicitation provision; (iv) a release of claims; and (v) an agreement to return keys, equipment, and passwords.

18. June 28, 2023, was Plaintiff's last day of employment at Parnall Law Firm.

19. Plaintiff gave birth to her baby on August 29, 2023.

20. Defendant paid Plaintiff a payment of six weeks of hourly wages at Plaintiff's normal rate of pay, in addition to other wages owed, following Plaintiff's decision to resign from employment at Parnall Law.

21. After her employment with Defendant was terminated, Plaintiff filed a Charge of Discrimination against Defendant with the New Mexico Department of Workforce Solutions on December 8, 2023, which was dual-filed with the Equal Employment Opportunity Commission.

**B.    Contested Material Facts.**

**1.    Plaintiff's Contentions:**

***Background Facts on Defendant Parnall Law Firm***

**A.** In the last ten years, Parnall Law Firm has grown to employ about 105 individuals and has set an annual revenue goal of twenty-five million dollars, a goal that has increased by about twenty to thirty-three percent, year over year, in the last few years.

**B.**  Defendant has a firm financial goal of 25 million dollars this year; last year, the goal was 20 million; in 2023, when Plaintiff was fired, the goal was 15 million; and in 2022, the goal was less than 15 million.

**C.**  In 2025, Parnall Law Firm is keeping up with the pace to reach its firm financial goal.

**D.**  Over the eight years before Plaintiff's employment with Defendant was terminated, the firm experienced very rapid growth.

***Plaintiff's Work Performance***

**E.**  Plaintiff understood that, because her supervisor thought she did a good job in the role of Medical Records Assistant, her supervisor also started training her as a Medical Paralegal.

**F.**  While training as a Medical Paralegal, Plaintiff was also satisfactorily performing the duties of the Medical Records Assistant.

**G.**  There were no complaints against Plaintiff during her time as a Medical Records Assistant or Medical Paralegal Trainee.

**H.**  When Ms. Fraire moved Plaintiff to the role of Legal Assistant, Ms. Fraire said she was excited for Plaintiff, thought she would do a good job, and did not express any concern about Plaintiff's previous work.

**I.**  Ms. Brown began supervising Plaintiff shortly after Plaintiff became a Legal Assistant.

**J.**  When Ms. Brown began supervising Plaintiff, Ms. Brown was new to supervising.

**K.**  Prior to Ms. Brown, Plaintiff was supervised directly by Robin Niklinski, who was also new to the supervisor role and who continued indirectly supervising Plaintiff after Ms. Brown took over.

**L.**  At the time Plaintiff worked at Parnall Law Firm, she was the only Legal Assistant who had the responsibility of performing administrative tasks for a satellite office in Santa Fe.

**M.** Defendant was aware that Plaintiff routinely performed most of the administrative tasks for the satellite Santa Fe office.

**N.** Plaintiff had a different role from any other Legal Assistant at Parnall Law Firm.

**O.** Defendant's impression, evaluations and conclusions of her work performance did not account for her work as an Office Administrator.

**P.** When attorneys or visitors were using the Santa Fe office for meetings or hearings, Plaintiff could not make a phone call or speak out loud because she would be heard by visitors or on the meeting or hearing.

**Q.** Defendant relies on the Smart Advocate Staff Performance Reports to show staff "metrics" regarding case load and overdue tasks.

**R.** However, the metrics reported in the Smart Advocate Staff Performance Reports are not entirely accurate, even if you know which roles a staff member was fulfilling.

**S.** While Plaintiff admits that Smart Advocate showed she often did not have fewer than 50 overdue tasks, it also showed that the other Legal Assistants often did not have fewer than 50 overdue tasks either.

**T.** While Plaintiff could have modified her tasks to change the deadlines, dropping her overdue task number, as other Legal Assistants did, she did not make a practice of this.

**U.** On June 28, 2023, the Smart Advocate documentation showed Plaintiff had the highest case load of all Legal Assistants.

**V.** Ms. Niklinski never did anything to help Plaintiff with her metrics or work performance.

**W.** Ms. Fraire never met with Plaintiff about her metrics or work performance.

**X.** Ms. Brown admits now that she would have trained Plaintiff in a different way in person.

***Defendant's Treatment of Plaintiff***

**Y.**  After Plaintiff shared her pregnancy status with Defendant, management treated her more as an annoyance than with consideration for a pregnant person who was trying to go above and beyond, running the Santa Fe office.

**Z.**  The tasks that Plaintiff was doing as an Administrative Assistant/Office Administrator of the Santa Fe office never became an issue until after Plaintiff was pregnant.

**AA.**    Plaintiff observed that taking over another Legal Assistant's tasks while that Legal Assistant was on maternity leave was stressful for Ms. Brown.

**BB.**    When Plaintiff became pregnant, Ms. Brown started treating Plaintiff differently.

**CC.**    If Plaintiff was late to morning huddle, typically, the reason was due to office administrative tasks and Ms. Brown was originally very understanding but, after Plaintiff became pregnant, this was suddenly an issue.

**DD.**    Ms. Brown's attitude worsened when Plaintiff used unpaid time off while pregnant with COVID after Plaintiff's doctor told her she was high risk and had to stay home and rest. Nevertheless, Ms. Brown sent an email of reprimand to Plaintiff's personnel file, thereafter, giving Plaintiff no consideration that having COVID put her behind on metrics.

**EE.**    Ms. Brown misled Plaintiff by saying that, "per our policy," unpaid time was not allowed, and a report would be placed in Plaintiff's file for using unpaid time the week of January 30, 2023, while Plaintiff was out pregnant with COVID.

**FF.** But Ms. Brown was citing the new Parnall Law Firm unpaid time off policy that Plaintiff was not given until Feb 9, 2023, two weeks after being out with COVID while pregnant.

**GG.**    The old Employee Handbook did not prohibit unpaid time off.

**HH.**     For the specific "friend of Bert" case that Defendant says was "the last straw," with Plaintiff, the issue creating a delay in the rental car was not solely Plaintiff's responsibility but was also that of the Case Manager and the Property Paralegal at the time.

**II.**  Plaintiff could not open a claim until the assigned Case Manager completed their tasks.

*Defendant's Discipline of Plaintiff for Reporting Bullying*

**JJ.** In early-April 2023, Plaintiff reported bullying based on emails between Plaintiff and a coworker, Corina Hopkins, group chat messages between Ms. Hopkins and Plaintiff, and a posting by Ms. Hopkins referencing Plaintiff.

**KK.**     Ms. Fraire conducted an investigation into Plaintiff's bullying report, but Ms. Fraire did not interview Plaintiff or consider any of the bullying group messaging or the post when she performed her "investigation."

**LL.**     Ms. Hopkins is a family friend of Ms. Fraire and Ms. Fraire referred Ms. Hopkins to work at Parnall Law Firm.

**MM.**     Ms. Fraire redirected only Plaintiff not Ms. Hopkins after Plaintiff reported the bullying.

**NN.**     Plaintiff didn't think it would be productive to make a report to Mr. Parnall about Ms. Hopkins' bullying because she felt that since Ms. Fraire, as second in command, didn't take Plaintiff seriously, Mr. Parnall wouldn't take it seriously either.

*Defendant's Creation of the "Ultimatum"*

**OO.**     Mr. Parnall, Mr. Abel, and Ms. Fraire discussed whether to keep or fire Plaintiff between June 12, 2023, to June 14, 2023, and they finally agreed to give Plaintiff the options "to stay and do the job or take the money and leave."

**PP.** To facilitate the decision of whether to fire Plaintiff, Ms. Fraire talked to Plaintiff's supervisors, Ms. Brown and Ms. Niklinski, who supported terminating Plaintiff's employment.

**QQ.** Greg Abel, an attorney who is part of the "Administrative Round Table" management of Parnall Law Firm, was concerned about the appearance of firing Plaintiff because she was taking maternity leave in the coming months.

**RR.** Defendant's decision to give Plaintiff the option to resign and receive six weeks' pay instead of firing her was "a compromise" between Mr. Abel's concern of how the law firm would look and Mr. Parnall's wanting to go ahead and fire her now.

**SS.** The ultimatum was not even suggested until Mr. Abel communicated his concern about firing Plaintiff before she was going on maternity leave.

**TT.** It was not until after Mr. Abel objected to firing Plaintiff because of the appearance of terminating Plaintiff when she was pregnant that Defendant decided to obtain a release of claims from Plaintiff.

**UU.** Defendant wanted a release of claims from Plaintiff because Mr. Abel was concerned about how it would look for Defendant to terminate someone who was pregnant and who was going to take maternity leave.

**VV.** Defendant decided to give Plaintiff the option of staying if she could improve her metrics because Parnall Law Firm was concerned about how it might look to fire somebody who was pregnant and about to take maternity leave.

*The June 27, 2023, Meeting*

**WW.** On June 27, 2023, Defendant knew Plaintiff was pregnant and would be taking maternity leave in September.

**XX.** Ms. Fraire unexpectedly asked to meet with Plaintiff over Zoom on June 27, 2023.

**YY.**    During the meeting on June 27, 2023, Defendant told Plaintiff she could either: (1) continue to work at Parnall Law Firm, but she must 100% commit to meeting her metrics, and if she cannot meet her metrics, she would be terminated with no separation package; or (2) Defendant would pay Plaintiff six weeks paid hourly wages if she chose to cease working at Parnall Law Firm now (the "Ultimatum").

**ZZ.**    Even though Mr. Parnall, Mr. Abel, and Ms. Fraire determined they would tell Plaintiff she had until July 2023 to get her metrics up or be fired, Defendant never said that to Plaintiff.

**AAA.**    Plaintiff wanted to work until she had her baby, take all paid leave (and potentially unpaid leave) available to her, and then return to work at Parnall Law Firm.

**BBB.**    Plaintiff did not plan to stay home with baby as hers was a two-income household.

**CCC.**    Plaintiff wanted more time to consider the choices presented by Defendant because she needed to talk about it with her husband and with an attorney.

**DDD.**    Originally, Defendant was going to give Plaintiff 24-48 hours to decide whether to stay and do the job or take the money and leave, but when Ms. Fraire met with Plaintiff in the afternoon of June 27, 2023, Plaintiff was given less than 24 hours to give an answer  because Mr. Parnall, a lawyer, expected Plaintiff to give a prompt response, which was determined to mean the next morning.

**EEE.**    When Ms. Fraire met with Plaintiff on June 27, 2023, Parnall Law Firm expected her to resign.

**FFF.**    Defendant can see how Plaintiff felt threatened on June 27, 2023, because Defendant thought Plaintiff would believe she could never meet her metrics and should just take the money.

**GGG.**    Defendant is not surprised that Plaintiff felt threatened on June 27, 2023, when she was told she was not meeting her metrics and could be fired at any time with no separation package.

*The June 28, 2023, Meeting*

**HHH.**    Plaintiff was upset, exhausted, scared and shocked the night before her meeting with Ms. Fraire on June 28, 2023.

**III.** Plaintiff's husband left the decision up to her, but they had stayed up the night before the June 28, 2023, meeting, reviewing their bills and trying to figure out what they would do if Plaintiff lost her job.

**JJJ.**    Plaintiff was hoping maybe she had misunderstood Ms. Fraire the day before during their meeting and that Defendant would let her stay, but Ms. Fraire's appearance and demeanor during the meeting made it clear that she was not going to accept anything other than for Plaintiff to quit.

**KKK.**    Even on the morning of June 28, 2023, Plaintiff was not sure what her decision would be.

**LLL.**    Plaintiff told Ms. Fraire she wished she could have more time, but Ms. Fraire did not say anything.

**MMM.**    When Plaintiff said she was feeling like the safer choice was to quit, Ms. Fraire agreed. Plaintiff then knew she would be fired if she did not quit, and she almost expected to be fired that minute if she did not.

**NNN.**    So, during the meeting on June 28, 2023, Plaintiff felt pressured to resign and ultimately determined that conceding to resign was the safer option.

**OOO.**    Plaintiff did not want to quit working at Parnall Law Firm, but she felt pressured to resign and did so.

**PPP.**    Based on Ms. Fraire's threatening tone and words, Plaintiff firmly believed she would be terminated without any payment if she stayed working at Parnall Law Firm.

**QQQ.**    When Plaintiff said she would resign, Ms. Fraire said, "I told you this job isn't for everybody. Maybe you'll have a better time being a stay-at-home mom."

**RRR.**    When, on June 28, 2023, Plaintiff told Defendant that she would resign and take the six weeks paid hourly wages, she did not agree to release claims against Parnall Law Firm or sign a release of claims against Parnall Law Firm as the issue had never even been raised, and Plaintiff was not expecting to be asked to do so nor had she any idea that she would be forced to do so after having already accepted the stated terms from the day before.

**SSS.**    It was only after Plaintiff told Defendant that she would take the second option that Defendant said it "was going to send her this paper to be signed," and that she would be disconnected from the system, and that "she had to sign if that was the option she was taking."

**TTT.**    It was not until after she accepted the offer from the day before, Plaintiff realized she was expected to sign a paper in order to receive the money.

**UUU.**    Plaintiff believed she had to sign the Written Contract before she was kicked off the Parnall Law Firm system, and recalls Ms. Fraire telling her that would happen in about five minutes.

**VVV.**    After Ms. Fraire sent the Written Contract to Plaintiff, Ms. Fraire watched her as Plaintiff tried to read it.

**WWW.**    Because she was so stressed and upset, trying to not break down crying, Plaintiff did not really know what she was looking at when looking at the Written Contract.

**XXX.**    After Plaintiff signed and sent back the Written Contract, she was kicked off the system about five minutes later.

**YYY.**    Plaintiff thought that signing the Written Contract was just part of the normal procedure for when someone is getting terminated and that it meant she understood Parnall Law Firm was terminating her.

**ZZZ.**    If Plaintiff had known that she was releasing her discrimination claims against Parnall Law Firm, she would not have signed the Written Contract.

**AAAA.**    Prior to Plaintiff, Defendant had not asked a non-attorney employee to sign a release of claims in about eight years.

**BBBB.**    After May 19, 2015, Defendant did not require any terminated non-attorney employee, except Plaintiff, to sign a release of claims in order to get some kind of severance.

**CCCC.**    While working at Parnall Law Firm, Plaintiff did not work with settlement agreements or releases of claims.

**DDDD.**    Prior to this lawsuit, Plaintiff was not familiar, nor did she have any experience with employment law or claims of discrimination, retaliation, or the Family Medical Leave Act ("FMLA").

**EEEE.**    It is not required to ask for FMLA and Parnall Law Firm does not specifically require an employee to ask for Parental Leave in order to take it.

**FFFF.**    Prior to conceding to resign and signing the Written Contract, Plaintiff was never informed by anyone at Parnall Law Firm about her FMLA, maternity or parental leave rights.

**GGGG.**    Now, Parnall Law Firm automatically informs pregnant women of their FMLA, maternity and parental leave rights when the Firm Administrator is informed of the pregnancy.

*The Separation of Employment Agreement ("Written Contract")*

**HHHH.**     Other than stating that unemployment claims are excluded, the release language in the Written Contract does not identify what rights Plaintiff had, nor did it explain which rights were purportedly being waived.

**IIII.**     The release language in the Written Contract was intended by Parnall Law Firm to include charges of discrimination with the Human Rights Bureau and EEOC.

**JJJJ.**     Mr. Abel believes the Written Contract was too simplistic and inadequate as a release.

**KKKK.**     In the offer made on June 27, 2023, there was no mention of "release of claims."

**LLLL.**     When Defendant made the verbal offer to Plaintiff on June 27, 2023, Defendant did not include in the offer that Plaintiff would have to sign a Separation of Employment Agreement if she wanted to accept the offer to resign in exchange for six weeks paid hourly wages.

**MMMM.**     When Defendant made the offer on June 27, 2023, Defendant did not include in the offer that Plaintiff would have to release claims against Parnall Law Firm if she wanted to accept the offer to resign in exchange for six weeks of paid hourly wages.

**NNNN.**     When Defendant made the offer on June 27, 2023, Defendant did not include in the offer that Plaintiff would have to agree not to bring a lawsuit against Parnall Law Firm if she wanted to accept the offer to resign in exchange for six weeks of paid hourly wages.

**OOOO.**     Parnall Law Firm did not, at any time, tell Plaintiff to consult with an attorney before making a decision on the offer presented on June 27, 2023.

**PPPP.**     Plaintiff had less than 18 hours to consider the options presented by Ms. Fraire on June 27, 2023.

**QQQQ.**     Ms. Fraire did not offer to review the Written Contract with Plaintiff.

**RRRR.**    Defendant did not, at any time, tell Plaintiff to consult with an attorney before signing the Written Contract.

**SSSS.**    The Written Contract does not state that the releasor has had the opportunity to consult with an attorney.

**TTTT.**    Plaintiff did not consult with an attorney prior to conceding to resign or signing the Written Contract, so did not receive the benefit of counsel prior to the same.

**UUUU.**    Defendant did not explain to Plaintiff during the June 27, 2023, or June 28, 2023, meetings what Plaintiff's rights are under the FMLA, NMHWA, NMHRA, or PLF's own policies and procedures (e.g., Maternity Leave, Parental Leave, Paid-Time Off).

**VVVV.**    The Written Contract makes no mention of resignation.

**WWWW.** The Written Contract does not indicate that it supersedes or replaces all other verbal and written agreements.

**XXXX.**    The Written Contract does not contain a Savings Clause or indicate that, if any part of the Written Contract is legally unenforceable, that the remainder of it is still valid and enforceable.

*After Termination*

**YYYY.**    If Plaintiff had delivered her baby on June 27, 2023, she would have been entitled 6 weeks of paid Maternity Leave, 2 weeks of paid Parental Leave, all remaining Paid-Time Off, and all of her remaining paid leave under the New Mexico Healthy Workplaces Act.

**ZZZZ.**    After Plaintiff was terminated, Parnall Law Firm reassigned Ms. Brown to work out of the Santa Fe office.

**AAAAA.** When Ms. Brown was reassigned by Parnall Law Firm to work in the Santa Fe office, she was not pregnant.

**BBBBB.**    Plaintiff has not spent the money Defendant gave her and is prepared to return it because she believes the way in which Defendant handled her termination was not right.

**CCCCC.**    In her Charge of Discrimination, Plaintiff specifically stated: "Parnall Law Firm illegally discriminated against Dominique in violation of the New Mexico Human Rights Act and violated the Pregnancy Discrimination Act of 1978 amended Title VII of the Civil Rights Act of 1964 to prohibit sex discrimination based on pregnancy. 42 U.S.C. §§ 2000e."

**DDDDD.**    Plaintiff disputes all facts asserted by Defendant.

**2.    Defendant's Contentions:**

A)    In 2021, after Plaintiff had relocated to Santa Fe, Plaintiff, who had never worked at a law firm, was told by her mother, who works at Parnall Law, to apply to work at Parnall Law.

B)    In August of 2021, Plaintiff applied to Parnall Law and underwent an intensive, weeks-long interview process before being offered the position of Medical Records Assistant in mid-September, 2021.

C)    Plaintiff began work as a Medical Records Assistant on or about September 17, 2021.

**Plaintiff's Training as a Medical Records Assistant**

D)    Upon hire, Plaintiff was trained on Parnall Law's policies and procedures, and she signed an acknowledgement of receipt of Parnall Law's Employee Handbook on September 17, 2021, and an acknowledgement of understanding on September 20, 2021.

E)    Parnall Law's Employee Handbook informed Plaintiff about Parnall Law's "Core Values," Talent, Teamwork, Truth, Tenacity, and Triumph, and it made clear that Plaintiff's

employment at Parnall Law would be "on an 'at-will' basis and may be terminated by Parnall Law or the employee at any time for any reason."

F)    Parnall Law's Employee Handbook identified Parnall Law's attendance policy, as well as its Paid Time Off policy and Parental and Maternity Leave policies.

G)    During her initial training, Plaintiff received training on attendance at daily required meetings.

**Plaintiff's Work as a Medical Records Assistant**

H)    Plaintiff's supervisor when she was a Medical Records Assistant was Eric Doyle.

I)    Mr. Doyle did not regularly review Plaintiff's work, as expected by Parnall Law, and after Mr. Doyle's employment with Parnall Law was terminated, Parnall Law had little information from which to judge Plaintiff's work as a Medical Records Assistant, and no one available to supervise Plaintiff in that position.

J)    Although Mr. Doyle did not regularly review or report on Plaintiff's work, Plaintiff did complete her initial three-month self-evaluation on December 20, 2021, and in his evaluation, Mr. Doyle indicated in the "Evaluation by Team Lead" section that they would "continue to our goal of getting your task list down further."

**Plaintiff's Move to the Santa Fe Office**

K)    Plaintiff initially performed work from her home in Santa Fe, and when Parnall Law opened an office in Santa Fe, Plaintiff helped establish that office and then began working from that office.  Plaintiff had a desk, computer, and phone in the Santa Fe office and was working in that office daily, before she became a Legal Assistant in July of 2022.

L)    Plaintiff performed significant work helping Parnall Law move into the Santa Fe office and establish that office between September of 2021, when Parnall Law initially leased the

Santa Fe office and the end of 2021, when the office had been furnished, suitable for work. Plaintiff continued to work "remotely," as the only member of the Case Manager Team in the Santa Fe office. Following her movement to the Legal Assistant role, Plaintiff did perform some administrative tasks in connection with the Santa Fe office, but Plaintiff was never assigned to be the administrator of that office, and the expectation from Parnall law was that Plaintiff would complete the tasks required in her Legal Assistant position.

M) Ultimately, Parnall Law firm management moved another individual, attorney David Link, into the Santa Fe office, to ensure that Plaintiff was not alone in the office, because she had indicated that she did not feel fully comfortable working in the Santa Fe office alone.

N) David Link was not Plaintiff's supervisor, nor did he oversee or have direct knowledge of Plaintiff's work.

**Plaintiff's Move to Legal Assistant**

O) Because Parnall Law did not have a clear record of Plaintiff's work as a legal assistant, and because there was no one in the Medical Records Team to supervise and continue to train Plaintiff, Ms. Fraire offered Plaintiff the position of Legal Assistant, within the Case Manager Team, which Plaintiff accepted.

P) Plaintiff began training for the position of Legal Assistant in July of 2022, while transitioning from her work as a Medical Records Assistant.

Q) During her training for the Legal Assistant position, Plaintiff received training on attendance at daily required meetings. Plaintiff also received training on opening insurance claims "(Don't take no for an answer)."

R) Plaintiff received a Legal Assistant job description as part of her training (referred to as a "scorecard" by Parnall Law). That Legal Assistant scorecard specified that a Legal

Assistant "must," among other tasks: (i) "[a]ttend weekly firm wide huddle every Monday morning at 8:00"; (ii) "[a]ttend daily team mini huddle Tuesday through Friday at 8:00 am"; (iii) "[o]pening all UM/UIM claims within 1 day of signed retainer; (iv) "[o]pening all Liability claims within 1 day of receipt of liability information from police report or IPRA"; and (v) "[e]nsure overdue tasks never exceed 50." Further, that Legal Assistant scorecard specified that it was part of a Legal Assistant's "Duties/Responsibilities" to "[c]omplete all CM/paralegal requests accurately and promptly."

      S)      Plaintiff's initial supervisor was her Team Lead, Robin Niklinski.

      T)      In September of 2022, Robin Niklinski was promoted to Team Director of the Case Manager Team, and a Case Manager, JaNeisha Brown, was promoted to the Team Lead position on September 12, 2022, supervising Plaintiff's work from that point forward.

      U)      After a period during which both Plaintiff and JaNeisha Brown settled into their new positions, JaNeisha Brown regularly "tweeked" with Plaintiff, which meant that she met with Plaintiff at least every two weeks to discuss Plaintiff's work output – her metrics – and timeliness of her task completion. Tweeking is a term used by Parnall Law to indicate regular meetings, held every two weeks – literally shorthand for "two-weekers" – although a supervisor might hold a tweek at any time.

      V)      On February 9, 2023, Plaintiff received and acknowledged an updated Employee Handbook for Parnall Law. That updated Employee Handbook contained an updated Vision Statement, indicating that Parnall Law sought "[t]o be the most respected and trusted personal injury firm across New Mexico." It contained the same Core Values as the previous version of the Employee Handbook. It reiterated that Plaintiff's employment was "on an 'at-will' basis and may be terminated by Parnall Law or the employee at any time for any reason." And it

contained an updated "Presence/Absence" section, detailing attendance requirements, Paid Time Off policy, Maternity Leave, Parental Leave, Family Medical Act Leave, and a then-new section separating out earned sick leave under the New Mexico Healthy Workplaces Act.

**Parnall Law's Measurement of and Use of Metrics**

W)      Parnall Law utilizes a computer-based case management platform called Smart Advocate. Through that platform, Parnall Law assigns tasks on a particular case to a particular job position.

X)      Legal Assistants are assigned cases alphabetically and randomly through Smart Advocate based on the first letter of the last name of the client. A particular Legal Assistant may, for instance, be assigned to cases with clients whose names begin with A through D.

Y)      Once a case is assigned to a Legal Assistant, the tasks associated with Legal Assistants automatically populate into Smart Advocate as tasks assigned to that Legal Assistant. Each task automatically identifies a due date, based on requirements for that task.

Z)      Legal Assistants are assigned approximately 10 tasks per case, including opening claims with the insurance company. Opening claims is thought to be the most important task assigned to a Legal Assistant, and Parnall Law requires that liability claims are opened "within 1 day of receipt of liability information from police report or IPRA" and "UM/UIM claims within 1 day of signed retainer."

AA)     Once a Legal Assistant completes all assigned tasks on a case, Smart Advocate still records them as being assigned to that case, even though there are no further Legal Assistant tasks to complete on that case. Accordingly, the assigned cases number on Smart Advocate does not provide accurate information concerning the number of cases on which a Legal Assistant may have active work. Further, Legal Assistants who have only been working in that role for a

short period will show a smaller number of assigned cases, whereas Legal Assistants who have been working longer will show a larger number of assigned cases.

AB)    When a Legal Assistant completes a task, the Legal Assistant marks the task as complete.  If a Legal Assistant cannot complete a task by the deadline, the task will either be identified as "overdue" or the Legal Assistant can modify the task and manually extend the deadline.  If the Legal Assistant modifies a task, it will be identified as "modified."

AC)    During the time that Plaintiff worked in the Case Manager Team, the Team had a goal to try to keep overdue tasks below 50.

**JaNeisha Brown's Supervision of Plaintiff as Her Team Lead**

AD)    During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at Parnall Law, through June 28, 2023, Ms. Brown supervised a total of four Legal Assistants, including: (i) Dominique Romero, beginning September 12, 2022; (ii) Esteban Marulanda, beginning September 12, 2022; (iii) Edgar Ortiz, beginning March 7, 2023, and ending May 8, 2023; and (iv) Jenny Montoya, beginning March 22, 2023.

AE)    During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at Parnall Law, through June 28, 2023, Plaintiff rarely kept her overdue tasks below 50, and JaNeisha Brown tweeked with Plaintiff on that issue, as well as opening claims timely and appearing for morning huddles on time, and coached with Plaintiff on those issues on a number of occasions, including: (i) October 28, 2022; (ii) November 10, 2022; (iii) November 15, 2022; (iv) December 14, 2022; (v) December 29, 2022; (vi) January 3, 2023; (vii) January 25, 2023; (viii) February 8, 2023; February 16, 2023 (ix) February 21, 2023; (x) February 24, 2023; (xi) March 22, 2023; (xii) April 5, 2023; (xiii) April 19, 2023; (xiv) May 3, 2023; (xv) May 4, 2023; (xvi) May 16, 2023; (xvii) June 13, 2023; and (xviii) June 16, 2023.

AF)    During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at Parnall Law, through June 28, 2023, Plaintiff consistently had the worst or among the worst metrics of the Legal Assistants Ms. Brown supervised.  Ms. Brown worked to try to help Plaintiff meet her metrics consistently, even assisting on completing tasks on Plaintiff's task list.

AG)    During JaNeisha Brown's tenure as Team Lead during Plaintiff's employment at Parnall Law, through June 28, 2023, Plaintiff was late to morning huddles a few times per month.

**Plaintiff's Failure to Open a Claim on a "Friend of Bert" Case**

AH)    On June 10, 2023, Bert Parnall received an email from an attorney at Parnall Law. At the time, Mr. Parnall was out of the country.  That attorney conveyed to Mr. Parnall that a client called Parnall Law on Saturday, June 10, 2023, that he spoke with the client, and that the client needed assistance opening a claim in order to be able to rent a car.

AI)    Mr. Parnall forwarded that email to Parnall Law's administrative team, Greg Abel and Roni Fraire, and reminded them that the client had come to Parnall Law "through [his] connection" and that opening a claim so the person could obtain a rental car should "be an absolute priority."  In response, on Monday, June 12, 2023, Ms. Fraire told Mr. Parnall that the "claim was set to be open on 6/7 by the legal asst Dominique," that "Dominique had not opened this claim and this is not acceptable."  Ms. Fraire further informed Mr. Parnall that "Dominique is not and has not been performing her role for a while now."

AJ)    Mr. Parnall responded that same day, June 12, 2023, stating "I would let Dominique go, with maternity leave being severance pay.  Unless that is a harsh thing to do to a mother.  If maternity leave is in September, and we've decided to let her go [](and I've heard

issues with her before; it's my impression she is not working while alone and remote), I suggest letting her go now."

AK)    Although Greg Abel responded the next day, June 13, 2023, that he was concerned about appearances, Mr. Parnall responded that "I prefer not to worry about appearances.  We have not fired anyone going on maternity leave before. . . . we're just delaying the inevitable."

AL)    Ms. Fraire responded to that email, indicating that she had talked to Plaintiff's supervisors, JaNeisha Brown and Robin Niklinski, and that, due to ongoing performance issues, they were "both ready to let her go."  Accordingly, Ms. Fraire proposed a plan to provide an ultimatum to Plaintiff, but to give her the choice to resign with a severance payment instead of committing to meeting metrics.

AM)    On June 13, JaNeisha Brown tweeked with Plaintiff about "Metrics and Opening Claims," following up with an email in which she stated that she "[c]onfirmed a claim was not opened timely on a Bert case and the client complained."  Ms. Brown recounted that she "[a]dvised that Bert is very very upset about this," and that "I am not sure what is going to happen and it is now out of my hands."

AN)    As of June 13, 2023, Parnall Law had sufficient information and reason to terminate Plaintiff's at-will employment.

**Plaintiff Informs Parnall Law of her Pregnancy**

AO)    Plaintiff informed a few people, including her mother, who works at Parnall Law, and Robin Niklinski, Director of the Case Manager Team, that she was pregnant on New Year's Eve, December 31, 2022.  Plaintiff informed JaNeisha Brown of her pregnancy sometime after

January 1, 2023, but before Parnall Law's employee "goal trip" in January of 2023. Plaintiff informed others at Parnall Law on that goal trip.

AP)    Plaintiff's water broke, and she went to the hospital to give birth on August 29, 2023.

**Plaintiff Alleges "Bullying" From a Case Manager/Paralegal**

AQ)    In March of 2023, a then-new Case Manager, Corina Calzada Hopkins, sent several emails to Plaintiff, to check on tasks that Plaintiff had been assigned, and to seek guidance and assistance in understanding which tasks had been completed, so that Ms. Hopkins could complete her own work.

AR)    Eventually, Plaintiff began responding "rock" to Ms. Hopkins, indicating that Plaintiff believed Ms. Hopkins's emails were unnecessary. On March 20, 2023, Ms. Hopkins reached out to her Team Lead, Robin Niklinski, asking for assistance, because Ms. Hopkins did not understand the "rock" responses, and to understand if she was not following some protocol.

AS)    Following that email, and before Plaintiff had told her Team Lead, JaNeisha Brown, that she believed she was being "bullied," Ms. Brown and Ms. Niklinski held a Zoom meeting including Plaintiff and Ms. Hopkins on March 21, 2023. Ms. Brown and Ms. Niklinski led a productive conversation, in which Ms. Hopkins was informed of how to check in Smart Advocate for task status, and spoke to Plaintiff about the importance of clear communication, so that everyone can work together as a team.

AT)    Subsequently, in her mid-year Self Review, on March 24, 2023, Plaintiff referred again to the communication with Ms. Hopkins and indicated that she had "experienced a little bit of unnecessary drama and bullying." In the Team Lead section, Ms. Brown recommended that Plaintiff read a book called Crucial Conversations, which is a book and process that all Team

Leads at Parnall Law are trained on, as a way to learn to communicate directly and have hard conversations. Ms. Brown even reached out to Ms. Fraire to get agreement to allow Plaintiff to take that training.

AU) Ms. Fraire subsequently reviewed Plaintiff's Self Review and then reached out to Ms. Brown, asking for all communications between Plaintiff and Ms. Hopkins and indicating that she thought Plaintiff's allegation about being "bullied" was a "very serious allegation." Ms. Brown responded with information concerning the meeting on March 21, 2023.

AV) Ms. Fraire then conducted an investigation into the allegations, and on April 12, 2023, met with Plaintiff over Zoom to discuss her investigation. At that meeting, Ms. Fraire expressed her findings that there was no bullying by Corina and reiterated that it was Plaintiff's job, as a Legal Assistant, to help the Case Manager when needed. Ms. Fraire also expressed that she hoped that Plaintiff had made progress on her reading of Crucial Conversations, to help Plaintiff communicate more effectively.

AW) Plaintiff does not know why Ms. Hopkins allegedly "bullied" her. Ms. Hopkins's requests from Plaintiff for further help were not related to Plaintiff's pregnancy. Although Ms. Fraire offered to set up a further meeting with Bert Parnall if Plaintiff wanted to pursue the matter further, Plaintiff declined to set up such a meeting.

**Plaintiff is Presented with an Ultimatum and Resigns**

AX) On June 27, 2023, Ms. Fraire met via Zoom with Plaintiff. Ms. Fraire indicated to Plaintiff that she wanted to speak about Plaintiff's plans for continued work at Parnall Law. Plaintiff indicated that she intended to "work until I – my water broke." Ms. Fraire then informed Plaintiff that she wanted to speak about Plaintiff's work performance, including Plaintiff's failure to open a claim timely on a Bert case. Ms. Fraire told her that Bert was upset

with Plaintiff because of that, and Ms. Fraire then offered Plaintiff to "either stay working here and give us your 100 percent, but you could be fired at any time for any reason, or you can take the six-week paid leave and leave effective immediately."

AY)     Plaintiff and Ms. Fraire did not talk about what type of leave Plaintiff might take for maternity, and Plaintiff did not ask for leave under the Family and Medical Leave Act or Parnall Law's policies at the meeting on June 27, 2023.

AZ)     Ms. Fraire gave Plaintiff until the next morning to decide.  On the morning of June 28, 2023, Plaintiff told Ms. Fraire that she was going to take the six weeks of pay and leave employment.

AAA)  Ms. Fraire then forwarded Plaintiff a proposed Separation Agreement, which Plaintiff reviewed and signed.

**Parnall Law Has Employed Other Pregnant Women Who Have Taken Leave**

AAB)  Parnall Law has had seven female employees take maternity leave in the past ten years, and six of those employees also took the extra two weeks of parental leave.

AAC)  Plaintiff's own sister, who works for Parnall Law, took maternity leave after Plaintiff resigned, and she returned to work at Parnall Law after that leave.

AAD)  Plaintiff was aware of other female employees at Parnall Law who took maternity leave when Plaintiff worked there and returned back to work after such leave.

AAE)  Employees at Parnall Law were encouraging when Plaintiff told them she wanted to start a family as early as early 2022, and Plaintiff never heard anyone at Parnall Law express concern about her pregnancy.

**Plaintiff Did Not Complain About Alleged Pregnancy Discrimination**

AAF)   Plaintiff never complained to her supervisor or anyone in the Case Manager Team or anyone in administration at Parnall Law that she believed she was being treated differently because of her pregnancy.

AAG)   Plaintiff did suggest to the other employee who worked in the Santa Fe office, David Link, on the day before she resigned her employment, that she thought that the reprimand she was receiving was related to her pregnancy.  But Mr. Link did not take Plaintiff's statement as any type of complaint, nor did Mr. Link report Plaintiff's statement to Plaintiff's supervisor or anyone in management at Parnall Law.  Indeed, Mr. Link, who was not Plaintiff's supervisor, did not have any basis to believe that Plaintiff was being singled out due to her pregnancy.

**Plaintiff Was Not Replaced**

AAH)   When a staff employee departs work at Parnall Law, they are not typically replaced with a new hire.  New hires are simply made when a need exists and after Parnall Law's rigorous hiring process.

AAI)   Since Plaintiff resigned her employment with Parnall Law in June of 2023, Parnall Law has hired various Legal Assistants, both male and female, but did not hire any additional Legal Assistant until February of 2024

## V.  APPLICABLE LAW

**A.**     **Do the parties agree which law controls the action?**

      __X__ Yes  _____ No

**If yes, identify the applicable law:**  the New Mexico Human Rights Act, NMSA 1978, §§ 28-1-1, *et seq*.; Title VII, 42 U.S.C. §§ 2000e – 2000e-17; the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k); the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq*.; the New Mexico

Declaratory Judgment Act, NMSA 1978, §§ 44-6-1, *et seq*.; New Mexico common law; federal common law interpreting statutes; and federal procedural law.

**If no, identify the dispute and set forth each party's position regarding the applicable law.**

    1.     Plaintiff – N/A

    2.     Defendant –  N/A

## VI.  CONTESTED ISSUES OF LAW

**Identify the specific issues of law which are contested.**

    **1.**     **Plaintiff**

***Declaratory Judgment – Separation Agreement***

A.  Whether the Separation of Employment Agreement is unenforceable.

B.  Whether the Separation of Employment Agreement lacks consideration.

C.  Whether Plaintiff and Defendant entered into an oral contract for Plaintiff's resignation that is a separate and distinct contract from the Separation of Employment Agreement.

D.  Whether the six week's paid wages paid by Defendant to Plaintiff is consideration for the oral contract for Plaintiff's resignation or the Separation of Employment Agreement.

E.  Whether the Separation of Employment Agreement contains an illegal release of claims that renders the entire contract void and unenforceable.

F.  Whether Plaintiff waived her Title VII or Family Medical Leave Act claims knowingly and voluntarily.

G.  If Plaintiff did not waive her Title VII or Family Medical Leave Act claims knowingly and voluntarily, whether the omission of a savings or severance clause renders the entire Separation of Employment Agreement void and unenforceable.

H.  Whether Plaintiff's signature on the Separation of Employment Agreement was obtained under duress.

I.  Whether the circumstances surrounding the execution of the Severance Agreement were such that Plaintiff was induced to enter into a contract she otherwise would not have entered into.

J.  Whether Defendant intentionally presented such a serious business or financial loss or injury to Plaintiff that she had no reasonable choice or alternative but to sign the Separation of Employment Agreement.

K.  Whether Defendant breached a contract with Plaintiff.

L.  Whether Defendant breached the covenant of good faith and fair dealing with Plaintiff.

***Pregnancy Discrimination***

M.  Whether Defendant discriminated in the terms and conditions of Plaintiff's employment due to her pregnancy.

N.  Whether Defendant took an adverse action against Plaintiff.

O.  Whether Defendant constructively discharged Plaintiff.

P.  Whether Plaintiff's pregnancy was a motivating factor of Defendant in the termination of Plaintiff's employment.

Q.  Whether Plaintiff's pregnancy was a motivating factor in Defendant's decision to give Plaintiff an ultimatum that included obtaining a release of claims from her.

R.  Whether Plaintiff's pregnancy was a motivating factor in its poor treatment of her prior to the termination of her employment.

S.  Whether Plaintiff suffered damages as a result of Defendant's discrimination.

***Breach of Contract***

T.  Whether an oral contract was formed on June 28, 2023, for Plaintiff's resignation in exchange for six weeks' pay that did not include the terms of the Written Contract ("Oral Contract").

U.  Whether Defendant failed to pay Plaintiff six weeks' pay pursuant to the Oral Contract.

V.  Whether Plaintiff suffered damages as a result of Defendant's breach of contract.

***Breach of Implied Cov. Of Good Faith and Fair Dealing***

W.  Whether Defendant utilized a contract to obtain a release of claims in such a way as to violate the implied covenant of good faith and fair dealing attendant to a contract.

X.  Whether Defendant wrongfully and intentionally used a contract to Plaintiff's detriment in order to obtain a release of claims from her.

Y.  Whether it was bad faith for Defendant to inform Plaintiff that she needed to sign a paper that included a release of claims in order to receive the benefit of a contract.

Z.  Whether Plaintiff suffered damages as a result of Defendant's breach of the implied covenant of good faith and fair dealing.

AA.    Whether the implied covenant of good faith and fair dealing applies to an oral contract.

***Fraud/Negligent Misrepresentation***

BB.    Whether Defendant had a duty to disclose that it would require Plaintiff to sign a release of claims if she resigned prior to her notifying Defendant she would resign.

CC.    If Defendant did disclose to Plaintiff that she would be required to sign a release of claims, whether that disclosure was recklessly made.

DD.     If Defendant did disclose to Plaintiff that she would be required to sign a release of claims, whether that disclosure was negligently made.

EE. Whether, prior to requiring Plaintiff to notify Defendant of whether she would resign, Defendant knew it would require Plaintiff to sign a release of claims if she resigned.

FF. Whether Defendant negligently, intentionally, or recklessly misled Plaintiff by failing to mention a release of claims prior to Plaintiff's acceptance of a contract.

GG.     Whether Defendant negligently, intentionally, or recklessly misled Plaintiff in Defendant's presentation of the release of claims to Plaintiff, including calling the release, "this paper."

HH.     Whether Defendant negligently, intentionally, or recklessly omitted information in order to induce Plaintiff to sign a release of claims.

II.  Whether Plaintiff relied on Defendant's omission(s) when she accepted the Oral Contract.

JJ. Whether Plaintiff relied on Defendant's omission(s) when signing the Separation of Employment Agreement that included the release of claims.

KK.     Whether Defendant's omission(s) was material.

LL. Whether Plaintiff suffered damages as a result of Defendant's fraud or negligent misrepresentations.

***FMLA Interference***

MM.     Whether Defendant violated the Family Medical Leave Act ("FMLA") with respect to Plaintiff's pregnancy and/or childbirth.

NN.     Whether Plaintiff was entitled to FMLA leave for her pregnancy and/or childbirth.

OO.     Whether Defendant took an adverse action against Plaintiff that interfered with Plaintiff's right to take FMLA leave.

PP. Whether Defendant's actions were related to the exercise or attempted exercise of Plaintiff's FMLA rights.

QQ.      Whether Defendant breached its duty to notify Plaintiff that FMLA coverage may apply to her pregnancy and/or childbirth.

RR.      Whether Plaintiff was prejudiced as a result of Defendant's FMLA violation(s).

### Interference with NMHRA and Title VII Rights

SS. Whether Defendant interfered with Plaintiff's rights to file a charge under Title VII of the Civil Rights Act of 1964 by requiring her to release her Title VII claims.

TT. Whether Defendant interfered with Plaintiff's rights to file a charge under New Mexico Human Rights Act ("NMHRA") by requiring her to release her NMHRA claims.

UU.      Whether Plaintiff has suffered damages as a result of Defendant's interference with her statutory rights under Title VII and/or the NMHRA.

### Punitive Damages

VV.      Whether Defendant's acts and/or omissions were willful, wanton, reckless, and/or undertaken with conscious disregard for and indifference to the rights of Plaintiff.

WW.      Whether Plaintiff is entitled to an award of punitive damages.

**2.    Defendant**

A.      Whether the Separation of Employment Agreement is an enforceable agreement.

B.      Whether Defendant breached the Separation of Employment Agreement.

C.      Whether Plaintiff has been harmed by any alleged breach of the Separation of Employment Agreement.

D.      Whether, if the Separation of Employment Agreement is unenforceable, any implied covenant of good faith and fair dealing would exist.

E.      Whether, if the Separation of Employment Agreement is enforceable, Defendant violated any implied covenant of good faith and fair dealing.

F.      Whether, if the Separation of Employment Agreement is enforceable, the release of claims and agreement not to sue in that agreement is enforceable and to what extent and as to which claims.

G.      What are the terms of the agreement entered into by Defendant and Plaintiff at the termination of her employment concerning payment of severance benefits and do they include the terms specified in the Separation of Employment Agreement.

H.      Whether Plaintiff was legally entitled to any Family and Medical Leave Act (FMLA) benefits at the time she quit her employment with Defendant.

I.      Whether Defendant constructively discharged Plaintiff.

J.      Whether, if Plaintiff suffered an adverse employment action in relation to her discharge, such action was taken to interfere with any rights she held under the FMLA, or was taken for legitimate reasons.

K.      Whether Plaintiff was constructively discharged in relation to her claims of pregnancy discrimination.

L.      Whether, if Plaintiff was constructively discharged in relation to her claims of pregnancy discrimination, such discharge was based on discriminatory animus or was made for legitimate reasons.

M.      Whether any reasons provided by Defendant for its employment decisions related to Plaintiff's employment are pretextual.

N.      Whether Plaintiff engaged in any protected activity under Title VII or the New Mexico Human Rights Act.

O.     Whether, if Plaintiff engaged in protected activity, Defendant's decisions related to her employment were made in retaliation for engaging in such activity.

P.     Whether Plaintiff exhausted her administrative remedies prior to filing her lawsuit with respect to claims under Title VII and the NMHRA.

## VII.  MOTIONS

**A.     Pending Motions—The parties identified the following motions as pending when they submitted the proposed Pretrial Order. All the identified motions have since been decided:**

1.     Plaintiff:

a.  Motion for Partial Summary Judgement against Parnall Law Firm for Breach of Oral Contract by Domonique Romero Valdez (Doc 93), filed on July 7, 2025;

b.  Motion for Partial Summary Judgement Implied Covenant of Good Faith and Fair Dealing, Fraud, and Pregnancy Discrimination (Doc 94), filed on July 7, 2025; and

c.  Motion for Partial Summary Judgment that the Separation of Employment Agreement is Unenforceable (Doc 95), filed on July 7, 2025.

2.     Defendant

a.     Motion for Summary Judgment on All Claims by Parnall Law Firm (Doc 88), filed on July 3, 2025;

b.     Motion for Summary Judgment Memorandum in Support of Counts IX, X and XII by Parnall Law Firm (Doc 91), filed on July 7, 2025; and

c.     Motion for Summary Judgment Memorandum in Support of Counts VI VII and VIII by Parnall Law Firm (Doc 92), filed on July 7, 2025.

**B.** **Motions which may be filed—Since the proposed Pretrial Order was submitted, all motions in limine have been decided. The other potential motions have not yet been filed:**

1.     Plaintiff – motions in limine; motions for directed verdict on the counterclaim;

any requested bench memos

2.     Defendant – motions *in limine*; motions for directed verdict; motions for

judgment notwithstanding the verdict; post-trial motions as needed

Briefing must be complete and filed with the Court by January 6, 2026, for Motions in

Limine.

## VIII.  DISCOVERY

**A.**     **Has discovery been completed?**   __X__   Yes _____ No

If no, discovery terminates on _____.

**B.**     **Are there any discovery matters of which the Court should be aware? No.**

## IX.  ANTICIPATED WITNESSES

*Each party is under a continuing duty to supplement this list and the description of anticipated testimony.  This does not, however, apply to a rebuttal witness.  Indicate if the witness will testify in person or by deposition and include a brief description of the anticipated testimony.  If the testimony is by deposition, identify the deposition by page number and line number.  A witness who has not been identified and whose testimony has not been disclosed may not testify at trial unless good cause is shown.*

**A.**     **Plaintiff's Witnesses:**

**1.**     **Plaintiff will call or have available at trial the following witnesses:**

a.     Dominique Romero-Valdez, Plaintiff – Ms. Romero-Valdez will testify to

the facts of her claims and the damages she has suffered as a result of Defendant's actions.

b.     Bertrand ("Bert") R. Parnall, attorney and owner of Defendant Parnall Law

Firm, LLC – Mr. Parnall is expected to testify to the facts related to the termination of

Plaintiff's employment with Defendant.

c.      Roni Fraire, Operations Manager at Parnall Law Firm, LLC, in her personal capacity and as a 30(b)(6) representative of Parnall Law Firm, LLC – Ms. Fraire is expected to testify to testify to the facts related to the termination of Plaintiff's employment with Defendant and matters related to Plaintiff's employment with Defendant, as well as Defendant's history of, and policies and procedures related to, the termination of employees, discipline of employees, evaluation of employee performance, and matters related to the various forms of leave Defendant offers to employees.

d.      JaNeisha Brown, Plaintiff's Supervisor at Parnall Law Firm, LLC – Ms. Brown is expected to testify to matters related to Plaintiff's employment with Defendant and Ms. Brown's supervision of Plaintiff and other employees.

e.      Greg Abel, Attorney at Parnall Law Firm, LLC – Mr. Abel is expected to testify to his knowledge of the facts surrounding Defendant's decision to terminate Plaintiff's employment and offer Plaintiff the Ultimatum, as well as his concerns about firing a pregnant employee about to take maternity leave.

**2.      Plaintiff may call the following witnesses:**

a.      David Link, Attorney at Parnall Law Firm – If called to testify, Mr. Link would testify to facts known to him about Defendant's treatment of Plaintiff during her employment with Defendant.

b.      Robin Niklinski, Pre-litigation Department Director at Parnall Law Firm, LLC – If called to testify, Ms. Niklinski would testify to matters related to Plaintiff's employment with Defendant and Ms. Niklinski's supervision of Plaintiff and other employees.

c.      Christopher Maldonado, Case Manager at Parnall Law Firm, LLC – If called to testify, Mr. Maldonado would testify to his observations regarding the negative change in treatment of Ms. Romero-Valdez by her supervisors at the Firm after she became pregnant.

d.      Esteban Marulanda, Case Manager at Parnall Law Firm, LLC – If called to testify, Mr. Marulanda would testify to his observations regarding the negative change in treatment of Ms. Romero-Valdez by her supervisors at the Firm after she became pregnant. Mr. Marulanda can also testify to the quality of Ms. Romero-Valdez's work.

e.      Yareth Marquez, Legal Assistant at Parnall Law Firm, LLC – If called to testify, Ms. Marquez would testify to Ms. Romero-Valdez's work ethic and quality of her work, as well as Ms. Romero-Valdez's heavy case load, which increased noticeably after she became pregnant. Ms. Marquez would also provide testimony as to her observations regarding Ms. Romero-Valdez's supervisors' disparate treatment of Ms. Romero-Valdez compared to other legal assistants, despite Ms. Romero-Valdez having the largest case load and working overtime many weeks.

f.      Rick Anglada, Investigation Lead at Parnall Law Firm, LLC – If called to testify, Mr. Anglada would testify to Ms. Romero-Valdez's work ethic and quality of her work. Mr. Anglada would also testify to the statements made by Roni Fraire regarding the reasons Ms. Romero-Valdez was no longer working at Parnall Law Firm.

g.      Whitney Romero, Plaintiff's sister, Physical Evidence Coordinator at Parnall Law Fim, LLC – If called to testify, Ms. Romero can provide testimony regarding Plaintiff's mental and emotional state after Parnall Law Firm increased her caseload and increased scrutiny of her work after she became pregnant. Ms. Romero can provide

testimony regarding Plaintiff's mental and emotional state after Parnall Law Firm effectively terminated Plaintiff's employment.

h.      Elana Varilek, Plaintiff's mom, Lead Intake Specialist at Parnall Law Firm, LLC – If called to testify, Ms. Varilek is expected to provide testimony regarding Plaintiff's mental and emotional state surrounding the time that Parnall Law Firm effectively terminated her employment.

i.      Danette Valdez, former employee of Parnall Law Firm, LLC, current address and phone number unknown. If called to testify, Ms. Valdez would testify to information regarding the issues raised in the Complaint and Counterclaim.

j.      Adrian Cordova, former employee of Parnall Law Firm, LLC – If called to testify, Mr. Cordova would testify to Plaintiff's strong work ethic and positive attitude.

k.      Joshua Rovelli, Attorney at Parnall Law Firm, LLC – If called to testify, Mr. Rovelli would provide testimony as to his observations regarding the increased scrutiny of Plaintiff's work by her supervisors after she became pregnant.

l.      Derek Valdez, Plaintiff's Spouse – If called to testify, Mr. Valdez would testify to the emotional toll Defendant's actions had on Plaintiff and the impact Defendant's actions had on his and Plaintiff's family and finances.

m.      Any witness necessary for authentication, rebuttal, or impeachment.

**B.    Defendant's Witnesses:**

1.      **Defendant will call or have available at trial the following witnesses:**

A.      Bert Parnall.  Mr. Parnall will provide testimony related to the business of Parnall Law Firm, LLC, its history and processes.  Mr. Parnall will provide testimony related to his role in making decisions related to Plaintiff's employment at Parnall Law Firm.

B.     Greg Abel.  Mr. Abel will provide testimony related to the management processes of Parnall Law Firm.  Mr. Abel will provide testimony related to his role in making decisions related to Plaintiff's employment at Parnall Law Firm.

C.     Robin Niklinski.  Ms. Niklinski will provide testimony related to her supervision and management of the work group in which Plaintiff worked at Parnall Law Firm, as well as her direct supervision and interactions with Plaintiff.  Ms. Niklinski will provide testimony concerning her role in supervising, correcting, and assisting Plaintiff and Plaintiff's direct supervisor, JaNeisha Brown, to attempt to meet expectations.  Ms. Niklinski will provide testimony concerning her thoughts about Plaintiff's performance, Plaintiff's separation of employment, and interactions she had with Parnall Law Firm management concerning Plaintiff.

D.     JaNeisha Brown.  Ms. Brown will provide testimony related to her supervision and management of Plaintiff.  Ms. Brown will provide testimony concerning her role in supervising, correcting, and assisting Plaintiff.  Ms. Brown will provide testimony concerning her thoughts about Plaintiff's performance, including how it related to other employees who she supervised and who were similarly situated to Plaintiff.  Ms. Brown will provide testimony related to her thoughts about Plaintiff's separation of employment, and interactions she had with Parnall Law Firm management concerning Plaintiff.

E.     Roni Fraire.  Ms. Fraire will provide testimony related to the management processes of Parnall Law Firm.  Ms. Fraire will provide testimony related to her role in making decisions related to Plaintiff's employment at Parnall Law Firm.  Ms. Fraire will provide testimony related to her supervision and management of the work group in which Plaintiff worked at Parnall Law Firm, as well as her direct supervision and interactions with Plaintiff.  Ms. Fraire will provide testimony concerning her role in supervising, correcting, and assisting

Plaintiff and Plaintiff's direct supervisors, JaNeisha Brown and Robin Niklinski, to attempt to meet expectations. Ms. Fraire will provide testimony concerning her thoughts about Plaintiff's performance, Plaintiff's separation of employment, and her participation with Parnall Law Firm management concerning Plaintiff. Ms. Fraire will provide testimony concerning presentation of an ultimatum to Plaintiff and presentation of the Separation of Employment Agreement. Ms. Fraire will provide testimony concerning details of Plaintiff's work history.

    **2.**       **Defendant may call the following witnesses:**

    F.       Madison Wilson. Ms. Wilson may provide testimony concerning her experience working at Parnall Law, including taking maternity-related leave and being pregnant at Parnall Law.

    G.       Arya Castorena. Ms. Castorena may provide testimony concerning her experience working at Parnall Law, including taking maternity-related leave and being pregnant at Parnall Law. Ms. Castorena may also testify concerning communications with Plaintiff.

    H.       Catri Estime. Ms. Estime may provide testimony concerning her experience working at Parnall Law, including taking maternity-related leave and being pregnant at Parnall Law. Ms. Estime may also testify concerning communications with Plaintiff.

    I.       David Link. Mr. Link may provide testimony concerning his experience working in the Santa Fe office of Parnall Law with Plaintiff, as well as conversations and correspondence he had with Plaintiff.

    J.       Whitney Romero. Ms. Romero may provide testimony concerning her experience working at Parnall Law, including taking maternity-related leave and being pregnant at Parnall Law. Ms. Romero may provide testimony concerning her communications with Plaintiff concerning Plaintiff's work at Parnall Law and this case.

K.      Elana Varilek.  Ms. Varilek may provide testimony concerning her experience working at Parnall Law.  Ms. Varilek may provide testimony concerning her communications with Plaintiff concerning Plaintiff's work at Parnall Law and this case.

L.      Corina Calzada.  Ms. Calzada may provide testimony concerning Plaintiff's allegation that she was bullying Plaintiff.

M.      Any witness necessary for rebuttal, authentication, or impeachment.

## X.  TRIAL PREPARATION

**A.      Exhibits.**

The parties must confer over all trial exhibits.  This does not apply to rebuttal exhibits that cannot be anticipated before trial.  The parties must file a "consolidated exhibit list identifying all exhibits that the parties have stipulated are admissible" and a "consolidated exhibit list identifying all exhibits the parties have stipulated to be authentic, but to which there are other objections" no later than fourteen (14) calendar days before the pre-trial conference.

For those exhibits on which a stipulation could not be reached, the offering party must file a separate "contested exhibit list" no later than fourteen (14) calendar days before the pre-trial conference.  Each party's contested exhibit list must be filed on the date identified in the preceding paragraph.      All exhibits must be marked before trial.  Exhibits must be marked numerically by Plaintiff on yellow labels and alphabetically by Defendant on blue labels.  The identification number or letter will remain the same whether the exhibit is admitted or not.

The Court will prepare its exhibit list based on the parties' submissions and will admit all exhibits to which the parties have no objection at the beginning of trial. Any contested exhibits will be admitted when offered, if the Court overrules any remaining objections.

**B.    Witness Lists.**

Each party's witness list must be filed with the Clerk and served on all parties by <u>December 24, 2025</u>. Indicate whether the witness is testifying by deposition or in person.  Objections to use of deposition testimony are due within <u>fourteen (14) days</u> before the pre-trial conference.  The objecting party must mark those portions of the requested deposition testimony to which the party objects.  Marking must comply with D.N.M.LR-Civ. 10.6.  The parties must confer about any disputes and, if unable to resolve any differences, must notify the Court in writing at least <u>seven (7) calendar days</u> before the pre-trial conference.

**C.    Voir Dire.**

1.    If allowed, do the parties wish to participate in voir dire?

Plaintiff            <u>    X    </u> Yes  <u>        </u> No

Defendant          <u>    X    </u> Yes  <u>        </u> No

2.    Each party wishing to participate in voir dire must serve on all parties and file with the Clerk a pleading entitled "Proposed Voir Dire Questions."  The pleading must identify the specific areas about which the party wishes to inquire and must set forth proposed voir dire questions.  This request must be filed at least <u>fourteen (14) days</u> before the pre-trial conference.

**D.    Jury Instructions and Verdict.**

**1.    In General.**  The parties must confer about proposed jury instructions.  The Court will prepare and provide the parties with a Court-proposed set of general "stock" instructions that will be given.  The stock instructions are available from the Court's web site.  The instructions that the parties must submit to the Court will be those which set

forth the elements and definitions of the claims or charges, and the elements and any definitions of any defenses.

2.      **Sources for Instructions.**  If pattern instructions are followed by the judge, the judge will indicate at the pretrial conference his or her preference for the source of instruction.

3.      **Submission of Proposed Instructions.**  The parties must submit one mutually approved set of jury instructions no later than fourteen (14) days before the pre-trial conference.  For those instructions the parties were unable to agree upon, each party must submit its own proposed instructions at the same time as submission of the mutually agreed instructions.

4.      **Form of Instructions.**

    a.      Submit sets of double-spaced instructions as follows:

    __ sets of originals without citations and headed "Instruction No. ___"; and

    __ set(s) with citations and numbered accordingly, one of which will be filed.

    b.      If requested, also submit all instructions in a format compatible with MS Word.  Please refer to the procedures, available on our web site, for electronically submitting proposed text.

    c.      Submit no more than one instruction to a page.

    d.      All deviations from pattern instructions must be identified as "modified" in the citation and the modification must be highlighted in the body of the instruction.

    e.      Submit a cover sheet on all sets of instructions.

**5.**     **Deadlines for Submitting Instructions**.

a.     Instructions shall be filed fourteen (14) days before the pre-trial conference.

b.     Supplemental unanticipated jury instructions may be submitted at trial.

**E.**     **Statement of Case.**

The parties must confer and submit an agreed statement of the case to the Court that will be read to the jury panel during jury selection.  The statement must be submitted to the Court fourteen (14) days before the pre-trial conference.

## XI. OTHER MATTERS

**A.**     **Settlement Possibilities.**

1.     The possibility of settlement in this case is considered:

___X____ Poor        _____ Fair    _____ Good    _____ Excellent    _____ Unknown

2.     Do the parties have a settlement conference set with the assigned Magistrate Judge?

_____ Yes    _____ No    If yes, when?

If a settlement conference has already been held, indicate approximate date: <u>July 18, 2025</u>

Would a follow-up settlement conference be beneficial?        _____ Yes    _____ No

__X____ **Unknown**

3.     Does either party wish to explore any alternatives for dispute resolution such as mediation or a summary jury trial?

If yes, please identify:  _____

If no, explain why not: ____It is possible that a second mediation could be useful,

depending on the outcome of all pending summary judgment motions

_____

**B.**     **Length of Trial and Trial Setting.**

1.     This action is a    _____ Bench Trial    _____ Jury Trial    __X__ Both

2.     The case is set for trial on <u>February 2, 2025</u>.

3.     The estimated length of trial is <u>5</u> day(s).

## XII. EXCEPTIONS

Plaintiff takes exception to Defendant's refusal to stipulate to the following facts, which Defendant has already admitted and which Plaintiff should not have to prove again:

- Plaintiff's Fact YY;

- Plaintiff's Fact KKKK – Defendant did not dispute this fact in its Response to Plaintiff's Motion for Partial Summary Judgment on Breach of Implied Covenant of Good Faith and Fair Dealing, Fraud, and Pregnancy Discrimination [Doc. 116], but "takes issue with the phrasing." So, Plaintiff proposes adopting the Court's language used in Doc. 145, "[A] release of claims was not discussed in conjunction with the oral offer[.]";

- Plaintiff's Fact LLLL;

- Plaintiff's Fact MMMM;

- Plaintiff's Fact NNNN;

- Plaintiff's Fact OOOO;

- Plaintiff's Fact PPPP;

- Plaintiff's Fact RRRR;

- Plaintiff's Fact SSSS;

- Plaintiff's Fact TTTT;

- Plaintiff's Fact UUUU;

- Plaintiff's Fact WWWW; and

- Plaintiff's Fact XXXX.

Plaintiff has pled a claim for negligent misrepresentation "in the alternative" under Fed. R. Civ. P. 8 by alleging in her Second Amended Complaint that Defendant made a false statement about the separation of employment agreement, whether the false statement or false *misrepresentation* was intentional and fraudulent or whether it was innocent and simply *negligent*. [Doc. 27, at ¶¶ 40, 82-83,150, 157]. Plaintiff has sought all damages available to her for *negligence*, *misrepresentation*, fraudulent conduct, willful and/or reckless conduct. [Doc. 27, at ¶¶ 40, 144, 150, 158]. Plaintiff discussed misrepresentation in the SAC. Plaintiff has pled that Bert Parnall "knew or should have known" that an employee who believes their civil rights have been violated would not knowingly release claims for less money than she would have received under PLF's maternity/parental leave policy. Further, Plaintiff has pled that, "Under New Mexico law, *misrepresentation* of a material fact, *even if innocently made*, will entitle the party who has justifiably relied on that fact to rescind the contract." SAC, ¶157. Moreover, Defendant has admitted to Requests for Admissions that pertain directly to Plaintiff's claim for negligent misrepresentation by admitting:

- When PLF made the verbal offer to Ms. Romero-Valdez on June 27, 2023, PLF did not include in the offer that Ms. Romero-Valdez would have to sign a Separation of Employment Agreement if she wanted to accept the offer to resign in exchange for 6 weeks paid hourly wages. PLF Request for Admissions, April 15, 2025, attached hereto as Ex. 2 ("PLF RFAs"), Request for Admission No. 8.

- When PLF made the offer on June 27, 2023, PLF did not include in the offer that Ms. Romero-Valdez would have to release claims against PLF if she wanted to accept the offer to resign in exchange for 6 weeks of paid hourly wages. PLF RFAs, Request for Admission No. 9.

- When PLF made the offer on June 27, 2023, PLF did not include in the offer that Ms. Romero-Valdez would have to agree not to bring a lawsuit against PLF if she wanted to accept the offer to resign in exchange for 6 weeks of paid hourly wages. PLF RFAs, Request for Admission No. 10.

- The "Separation of Employment Agreement" did not indicate that it supersedes or replaces all other verbal and written agreements. PLF Supp RFAs, Request for Admission Nos. 14.

Defendant takes exception to Plaintiff's inclusion of "negligently" in relation to the entry into the Separation of Employment Agreement. Plaintiff does not have a claim for negligent misrepresentation in this matter. This exception specifically concerns statements in Plaintiff's contested issues of law CC, EE, FF, and GG.

Defendant takes exception to Plaintiff's contested issue of law R concerning whether discriminatory animus played any role in alleged poor treatment of Plaintiff during her employment. Plaintiff's claims of discrimination as well as interference with FMLA benefits concern her termination specifically. Plaintiff should not be allowed to materially alter her legal theories at this point in the case.

Defendant takes exception to Plaintiff's Contested Material Facts DD, EE, FF, and GG, because they concern a claim under the New Mexico Healthy Workplaces Act, which claim has been dismissed by the Court. Those facts are therefore not relevant to the current matter.

The Court has taken the issue as to whether Plaintiff adequately pled a claim for negligent misrepresentation under advisement.

## XIII. MODIFICATIONS-INTERPRETATION

The Pretrial Order when entered will control the course of trial and may only be amended *sua sponte* by the Court or by consent of the parties and Court approval.  The pleadings will be deemed merged herein.

The foregoing proposed Pretrial Order (prior to execution by the Court) is hereby approved this 23rd day of December, 2025.

ADAMS+CROW LAW FIRM

*/s/ Samantha Adams* _____
Samantha M. Adams
Arlyn Crow
Hannah Kohler
5051 Journal Center Blvd. NE, Suite 320
Albuquerque, NM 87109
(505) 582-2819
Sam@adamscrow.com
Arlyn@adamscrow.com
Hannah@adamscrow.com
*Attorneys for Plaintiff*

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

  /s/ William G. Gilchrist _____
William Gilchrist
Lisa G. Zammiello
P.O. Box 1888
Albuquerque, NM 87103
(505) 765-5900
dgilchrist@rodey.com
lzammiello@rodey.com
*Attorney for Defendant*

The Court hereby enters the Pretrial Order submitted by the parties and as amended by the Court.

Dated: January 29, 2026

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent